1  Michael Pancer (State Bar No. 43602)
LAW OFFICES OF MICHAEL PANCER
2  105 West F Street, 4th Floor
San Diego, CA 92101
3  Tel: (619) 236-1826
Fax: (619) 233-3221
4  mpancer@hotmail.com

5  L. Barrett Boss (*pro hac vice motion pending*)
COZEN O'CONNOR
6  1627 I Street, N.W., Suite 1100
Washington, D.C. 20006
7  Tel: (202) 912-4818;  Fax: (866) 413-0172
bboss@cozen.com
8

9  Attorneys for Movant
Account Services Corporation

FILED

2009 JUL 10 PM 1:19

CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY _____ DEPUTY

**ORIGINAL**

10  **UNITED STATES DISTRICT COURT**

11  **SOUTHERN DISTRICT OF CALIFORNIA**

12  '09 CV 1495 JM    RBB

13  In the Matter of the Seizure of ALL
FUNDS ON DEPOSIT AT UNION
14  BANK, N.A., IN SAN DIEGO,
CALIFORNIA, IN ACCOUNTS
15  353000248 AND 353000256, AND ALL
FUNDS ON DEPOSIT AT WELLS
16  FARGO BANK, IN ESCONDIDO,
CALIFORNIA, IN ACCOUNT NUMBER
17  7986104185, HELD IN THE NAME OF
ACCOUNT SERVICES
18  CORPORATION, AND ALL PROPERTY
TRACEABLE THERETO,
19
20  ACCOUNT SERVICES
21  CORPORATION,

22               Movant.

23  _____
UNITED STATES OF AMERICA,
24
25               Respondent.
26

CASE NO. CV _____

**NOTICE OF MOTION AND
MOTION FOR RETURN OF
PROPERTY; MEMORANDUM
OF POINTS & AUTHORITIES;
DECLARATION OF COUNSEL;
EXHIBITS**

**[Fed. R. Crim. P. 41(g)]**

Judge:
Date:
Time:    _____
Place:   _____

27
28

TO:   THE UNITED STATES ATTORNEY FOR THE SOUTHERN DISTRICT
OF CALIFORNIA KAREN P. HEWITT, THE UNITED STATES
ATTORNEY FOR THE SOUTHERN DISTRICT OF NEW YORK LEV
DAESIN, AND ASSISTANT UNITED STATES ATTORNEYS ARLO
DEVLIN-BROWN AND JEFFREY ALBERTS:

PLEASE TAKE NOTICE that on August 10, 2009, at _____m., or as
soon thereafter as counsel may be heard, in the courtroom of the Honorable
_____, United States District Judge, movant Account
Services Corporation ("ASC"), by and through its counsel of record, will move this
Court pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure for the
release and return of funds totaling approximately $13,000,000.00  held in account
number 7986104185 with Wells Fargo Bank in Escondido, California, and funds in
excess of $1,000,000.00 held in accounts numbered 353000248 and 353000256
with Union Bank, N.A. in San Diego, California.  The Wells Fargo funds were
seized pursuant to a warrant, whereas the Union Bank funds were seized without a
warrant in the Southern District of California.  ASC respectfully submits that this
Court has equitable jurisdiction over this Motion, and requests the release and
return of the property for the reasons set forth in the attached Memorandum of
Points and Authorities.

This Motion is based on Rule 41(g) of the Federal Rules of Criminal
Procedure, on this Notice of Motion and Motion, the attached Memorandum of
Points and Authorities, the attached exhibits, and on such further evidence and
argument as may be presented at or before the hearing on this motion.

DATED:    July 10, 2009          Respectfully submitted,
LAW OFFICES OF MICHAEL PANCER


By:    Michael Pancer

1
**MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY
CASE NO:**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COZEN O'CONNOR

By:    L. Barrett Boss, *pending pro hac vice*
Attorneys for Movant
Account Services Corporation

MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY
CASE NO:

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

Account Services Corporation, through counsel, respectfully moves this Court to order the return of funds seized from Wells Fargo Bank ("Wells Fargo"), account number 7986104185, and from Union Bank, N.A. ("Union Bank"), in accounts numbered 353000248 and 353000256, pursuant to FED. R. CRIM. P. 41(g). Alternatively, counsel requests that this Court conduct an Evidentiary Hearing on the issues raised by this Motion. As grounds for this Motion, Account Services Corporation submits the following:

### FACTUAL BACKGROUND

Internet poker is a popular and widespread leisure activity in the United States. At least 10,000,000 Americans play internet poker, and some estimates set that figure substantially higher. Operators of online poker websites (collectively, "operators") offer internet poker players the option of either playing with "play money" (online credits) or "real money" (legal currency). If a player chooses to engage in wagering with real money, the player must deposit his or her funds into an account with an operator or an operator-designated third-party processor. At all times, the money on deposit is owned and controlled by the player. The funds are merely held in trust for the benefit of the player and released upon the player's request. *See, e.g.*, PokerStars End User License Agreement, attached as Exhibit 1.

### Account Services Corporation's Business Operations

Account Services Corporation ("ASC"), the movant in this action, is a payment processor with a business address in San Diego, California. ASC maintains bank accounts with Wells Fargo in Escondido, California, and Union Bank in San Diego, California. ASC processes payments for players, including those residing in California, who have real money accounts with operators or an operator-designated third-party processor. *See* Decl. of Douglas G. Rennick,

2

**MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY**
**CASE NO.**

1  attached as Exhibit 2.  More specifically, ASC's role is limited to processing the

2  return of an individual player's money per that individual's request.  When a

3  player wants to withdraw his or her funds, the player will so inform the operator or

4  the operator-designated third-party processor holding the funds in trust.  The

5  money is then forwarded to ASC with specific directions to return those funds to

6  the individual making the request.  ASC holds the funds in trust on behalf of the

7  player until such time as the payment can be processed.  The processing includes

8  confirming relevant facts (e.g. establishing the player's identity and state of

9  residence) and drafting a written check to the individual player.

10      As noted above, millions of Americans play internet poker.  It is

11  consequently not surprising that the number of players depositing funds with the

12  operators or operator-designated third party processors is quite large.  Similarly,

13  the number of individuals seeking to withdraw their funds at any one time is

14  significant.  In fact, it is not unusual for ASC to process the return of money for

15  thousands of players in any given month.  It is also worth noting that players

16  withdraw the money whenever and for whatever reason they see fit.  Each

17  individual's circumstance is unique.

18                          The Seizure

19      On June 2, 2009, the Office of the United States Attorney for the Southern

20  District of New York obtained a Warrant of Seizure on "all funds on deposit at

21  Wells Fargo Bank in San Francisco, California, in account number 7986104185,

22  held in the name of Account Services Inc."[1]  Warrant of Seizure (June 2, 2009),

23  attached as Exhibit 3.  The Warrant was issued on the basis of an affidavit filed

24  under seal by Federal Bureau of Investigation Special Agent Dana Conte.  Special

25  Agent Conte sought a Warrant of Seizure pursuant to 18 U.S.C. §§ 981, 984, and

26

27  [1] The warrant was served upon Wells Fargo's San Francisco Headquarters, despite
   the fact that the funds seized were on deposit at Well's Fargo's Escondido branch.

28

1   1955. The affidavit remains under seal. As of the date of this filing, no criminal or

2   civil action, including forfeiture, has been initiated with regard to this seizure.

3         About ten days later, on or around June 12, 2009, the U.S. Department of

4   Justice ("DOJ") seized – without a warrant – all funds on deposit at Union Bank, in

5   San Diego, California, in accounts numbered 353000248 and 353000256, both of

6   which are held in the name of ASC. Until recently, the only information ASC had

7   regarding this warrantless seizure is that which was received in a letter from Union

8   Bank, sent in response to ASC's inquiry about the accounts. *See* Letter of Manisha

9   Merchant, attached as Exhibit 4. According to the letter sent by Manisha

10  Merchant, Vice President and Senior Counsel of Union Bank, DOJ seized the

11  funds without a warrant, asserting non-specified exigent circumstances. *See Id.*;

12  Letter of Lev L. Dassin, attached as Exhibit 5. Union Bank was subsequently

13  served with a Warrant of Seizure pursuant to 18 U.S.C. §§ 981, 984, and 1955.

14  *See* Warrant of Seizure (June 24, 2009), attached as Exhibit 6. The warrant was

15  issued twelve days after the seizure, on the basis of an affidavit filed under seal by

16  Dana Conte, Special Agent of the Federal Bureau of Investigation. The affidavit

17  remains under seal. As of the date of this filing, no criminal or civil action,

18  including forfeiture, has been initiated with regard to this seizure.

19        The funds seized were held in accounts owned by ASC, and consist

20  overwhelmingly of money held in trust by ASC on behalf of approximately 13,800

21  individual poker players who requested the return of their money from an operator

22  or an operator-designated third-party processor, but also include ASC's operating

23  funds and a small amount of other funds unrelated to online poker. *See* Decl. of

24  Douglas G. Rennick, attached as Exhibit 2. The Wells Fargo account totaled

25  approximately $13.3 million, and the Union Bank accounts totaled over $1 million.

26  At the time of the seizure, ASC had over 13,800 hundred checks to individuals

27  outstanding, all of which bounced (or would have bounced) as a direct result of the

28  

4

**MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY**
**CASE NO.**

1   seizure. Undersigned counsel believes, based upon the limited facts available, that

2   the seizure was made pursuant to alleged violations of the Illegal Gambling

3   Business Act ("IGBA"), 18 U.S.C. § 1955, which prohibits conducting, financing,

4   managing, supervising, directing, or owning all or part of an illegal gambling

5   business. As will be set forth more fully below, neither Account Services, the

6   operators, nor the individuals whose funds have now been seized violated § 1955.

7   Thus, the Government had no legal authority to seize the funds in question, and

8   this Court should order the seized property returned.

**ARGUMENT**

9

10   **I.**     **This Court has Equitable Jurisdiction Under FED. R. CRIM. P.**

11       **41(g) to Return the Funds Seized and is the Proper Venue for this**

12       **Action**

13       Following a governmental seizure of property, FED. R. CRIM. P. 41(g) is the

14   appropriate method through which a party may recover the seized property if no

15   civil forfeiture or criminal proceeding has been initiated. In order to determine

16   whether the Court should entertain a motion for return of property under Rule

17   41(g), it must consider four factors, which are discussed below. If the Court finds

18   it has equitable jurisdiction to hear the motion, it must next consider whether the

19   seizure was reasonable under all the circumstances. In this case, analysis under the

20   four prongs, together with the unreasonableness of the seizure, dictate that this

21   Court order the return of seized funds to ASC.

22       The Southern District of California is the proper venue for ASC's motion

23   because the bank accounts from which the funds were seized were all located

24   within this district. Rule 41(g) mandates that motions for return of property be

25   filed "in the district where the property was seized." FED. R. CRIM. P. 41(g).

26   Under the "separate entity" rule, deposits are held at the branch where the account

27   is maintained. *See Trinh v. Citibank, N.A.*, 850 F.2d 1164, 1172 n.5 (6th Cir. 1988)

28

5

**MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY**
**CASE NO.**

1    ("The situs of a bank's debt on a deposit is considered to be at the branch where

2    the deposit is carried."); *Fidelity Partners, Inc. v. Philippine Export & Foreign*

3    *Loan Guarantee Corp.*, 921 F. Supp. 1113, 1119 (S.D.N.Y. 1996) ("the 'separate

4    entity' rule[] provides that 'each branch of a bank is a separate entity, [and is] in no

5    way concerned with accounts maintained by depositors in other branches or at a

6    home office.'") (internal citation omitted).  Here, ASC's Wells Fargo account was

7    opened and maintained through Wells Fargo Business Banking, located at 444 S.

8    Escondido Boulevard, Escondido, California; and its Union Bank accounts were

9    opened and maintained at Union Bank's San Diego Main Branch, located at 1201

10    Fifth Street, San Diego, California.  *See* Decl. of Douglas G. Rennick, attached as

11    Exhibit 2.  Therefore, this Court has jurisdiction and is the proper venue to hear

12    this Motion.

13    **A.    Rule 41(g) is the appropriate vehicle through which to seek return**

14    **of the seized funds**

15    Federal Rule of Criminal Procedure 41(g) provides:

16    A person aggrieved by an unlawful search and seizure of property or
by the deprivation of property may move for the property's return.

17    The motion must be filed in the district where the property was seized.

18    The court must receive evidence on any factual issue necessary to
decide the motion.  If it grants the motion, the court must return the

19    property to the movant, but may impose reasonable conditions to

20    protect access to the property and its use in later proceedings.

21    In this instance, FED. R. CRIM. P. 41(g) is the appropriate means for ASC to seek

22    release of the wrongfully seized funds because the Government has not instituted

23    proceedings for forfeiture on either a criminal or civil basis.  *See Ramsden v.*

24    *United States*, 2 F.3d 322, 324 (9th Cir. 1993) (internal citations omitted).  Rule

25    41(g) is described as "a vehicle for recovering seized but not forfeited property."

26    *Turner v. Gonzales*, No. 06-4020, 2007 WL 1302126, at *1 (7th Cir. May 3, 2007)

27

28

**MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY**
**CASE NO.**

1    (citing *United States v. Sims*, 376 F.3d 705, 708 (7th Cir. 2004); *United States v.*

2    *Howell*, 354 F.3d 693, 695 (7th Cir. 2004)).

3         The Ninth Circuit Court of Appeals has held that a motion for return of

4    property is proper where there are neither criminal proceedings nor civil forfeiture

5    proceedings pending against the movant. *See United States v. Baker*, No. CR-04-

6    40054 SBA, 2007 WL 4259556, at *1 (N.D. Cal. 2007) (citing *United States v.*

7    *Martinson*, 809 F.2d 1364, 1366-67 (9th Cir. 1987) ("A district court has

8    jurisdiction to entertain motions to return property seized by the government when

9    there are no criminal proceedings pending against the movant."); *United States v.*

10    *U.S. Currency $83,310.78*, 851 F.2d 1231, 1235 (9th Cir. 1988) (*cited in In re*

11    *Return of Seized Property v. U.S.*, Nos. 2:09-cv-459-FMC & 2:09-cv-1887-FMC-

12    JCX, 2009 WL 1651179, at *5 (C.D. Cal. June 11, 2009) (A Rule 41(g) motion is

13    properly denied once "a civil forfeiture proceeding has been filed, [because] the

14    claimant has adequate remedies to challenge any fourth amendment violation.")).

15    *See also Beard v. United States*, No. 208CV00949, 2008 WL 2132381, *3 (C.D.

16    Cal. Mar. 10, 2008) (citing *United States v. $8,850*, 461 U.S. 555, 569-70 (1983)

17    (Rule 41(g) "has been applied in other situations where the return of property is

18    sought, including requests by claimants for the return of property where no

19    criminal action is pending and no civil forfeiture proceedings have been

20    instituted.")).

21    **B.    This Court should entertain ASC's Rule 41(g) motion**

22         Prior to a district court reaching the merits on a pre-indictment FED. R.

23    CRIM. P. 41(g) motion, it must evaluate whether the underlying facts warrant such

24    consideration. The factors to consider in deciding whether to entertain such a

25    motion are as follows: 1) whether the Government displayed a callous disregard

26    for the party's constitutional rights; 2) the movant's interest in and need for the

27    property he seeks to have returned; 3) irreparable injury to the movant by denying

28

1     return of property; and 4) whether there exists an adequate remedy at law for

2     redress of the movant's grievance. *See Ramsden*, 2 F.3d at 325 (citing *Richey v.*

3     *Smith*, 515 F.2d 1239, 1243-44 (5th Cir. 1975)).

4        Each of the four factors are considerations to be weighed by the court; no

5     single factor is dispositive with regard to the court's exercise of equitable

6     jurisdiction. *See Meredith v. Erath*, 2001 U.S. Dist. LEXIS 16902 (C.D. Cal. Sep.

7     19, 2001) (exercising equitable jurisdiction and allowing motion for return of

8     property where "factors appear to be roughly equal": movant showed interest in

9     property and lack of adequate remedy at law, but failed to show irreparable harm

10    or callous disregard). In this case, it is clear that the facts justify the Court

11    considering this pre-indictment Rule 41(g) motion.

12        **1.**      **The government acted with callous disregard for the**

13              **movant's constitutional rights**

14        The government acted with callous disregard for the movant's constitutional

15    rights when it unreasonably and unlawfully seized the funds from ASC's Wells

16    Fargo and Union Bank accounts; in the case of the Union Bank accounts, without a

17    warrant. The Fourth Amendment of the United States Constitution protects

18    individuals from unreasonable governmental seizure of property. *See* U.S. CONST.

19    amend. IV. Seizures of property violate the Fourth Amendment unless they are

20    based upon probable cause and are executed pursuant to a valid search warrant.

21    *See United States v. Delgado*, 545 F.3d 1195, 1201 (9th Cir. 2008). Probable

22    cause for issuance of the warrant only exists when there is a fair probability that

23    the property is contraband or evidence of a crime. *See United States v. Davis*, 530

24    F.3d 1069, 1084 (9th Cir. 2008). Additionally, the Fifth Amendment of the United

25    States Constitution provides for protection against deprivation of "life, liberty or

26    property without due process of law." U.S. CONST. amend. V. Due process

27    requires notice and a hearing prior to seizure of property, unless exigent

28

1  circumstances exist. *See United States v. James Daniel Good Real Property*, 510

2  U.S. 43 (1993).

3      In this case, the seizure was unreasonable and in violation of ASC's Fourth

4  Amendment rights because, first and foremost, neither ASC, the individual players,

5  nor the operators violated the law. Any fleeting review of the IGBA, ASC's

6  business operations, or the nature of the funds held in the accounts would have

7  indicated to the government that there was no reasonable basis, much less probable

8  cause, to believe that the funds were contraband or evidence of a crime. Moreover,

9  the seizure of funds from Union Bank was executed without a warrant.

10  Accordingly, the government acted with callous disregard for ASC's constitutional

11  rights when it seized the funds.

12          a.    <u>ASC's corporate activities do not violate the IGBA</u>

13      First, ASC did not, nor could it, violate 18 U.S.C. § 1955. A cursory review

14  of the function of ASC as a funds processor would have revealed to the

15  government that ASC merely processes and returns individual player funds. The

16  conduct criminalized by § 1955, however, is that of conducting, financing,

17  managing, supervising, directing, or owning a "gambling business" in "violation of

18  the law of a State or political subdivision in which it is conducted." 18 U.S.C.

19  § 1955(b)(1), (i). Gambling, as defined under the statute, "includes but is not

20  limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or

21  dice tables, and conducting lotteries, policy, bolita or numbers games, or selling

22  chances therein." *Id.* § 1955(b)(2). Thus, to hold a business accountable as an

23  illegal gambling business under the IGBA, the government must show two things:

24  first, the business must be in the business of gambling as that term is defined by the

25  statute, and second, the business must be operated in violation of the law of the

26  state in which it is operating.

27

28

**MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY
CASE NO.**

1    ASC is in the business of processing checks, not in the business of

2  conducting any kind of gambling operation.  The fact that ASC processes checks

3  for online poker players does not render ASC in the business of gambling in any

4  way.  Even if the government were to allege that ASC is somehow involved in the

5  conduct of a gambling business, online poker is not an illegal gambling business,

6  as discussed more thoroughly below.  Indeed, we are unaware of any criminal

7  prosecutions of payment processors who process checks primarily for online poker

8  players.  ASC, as trustee for the players, had the right and the obligation to safely

9  maintain the players' funds until the money was received by the individuals; the

10  government acted with callous disregard for that right.

11    b.    The majority of the funds seized belonged to individual

12         poker players who did not violate the law

13    The vast majority of the funds seized from ASC belonged to individual

14  poker players, for whom ASC was holding money in trust while processing

15  payment of that money to the players.  The law is clear that individual poker

16  players cannot violate § 1955.  The IGBA was not intended to regulate online

17  poker players.  For a violation of § 1955 to occur, someone must first be

18  conducting an "illegal gambling business."  18 U.S.C. § 1955(b)(1).  When

19  Congress enacted § 1955, it made clear that the term "'conducts' does not include

20  the player in an illegal game of chance, nor the person who participates in an

21  illegal gambling activity by placing a bet." *United States v. George*, 568 F.2d

22  1064, 1071 (4th Cir. 1978); *United States v. McHale*, 495 F.2d 15, 18 (7th Cir.

23  1974); *United States v. Becker*, 461 F.2d 230, 232 (2d Cir. 1972), *judgment*

24  *vacated on other grounds by* 417 U.S. 903 (1974); *see also* 1970 Cong. & Admin.

25  News, p. 4029.  There is no evidence whatsoever that the individual players for

26  whom the seized funds were being held were in any way engaged in financing,

27  managing, supervising, directing, or owning all or part of an illegal gambling

28

10
**MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY**
**CASE NO.**

1    business.  Accordingly, the players are not in violation of § 1955, nor are the funds

2    seized proceeds of an illegal gambling business.  Moreover, players' monies

3    cannot be subject to seizure or civil forfeiture under 18 U.S.C. § 981 because the

4    players did not violate any law that may serve as a predicate for forfeiture under

5    that statute.  Thus, the seizure of these funds was unlawful, unreasonable, and

6    effected with callous disregard for the players' rights.

7                    c.    <u>Online poker is not illegal gambling</u>

8            Even if the government, under an expanded notion of liability, were to argue

9    that seizure of the funds was lawful because the funds were used to play online

10   poker, such an argument is made with callous disregard for ASC's Fourth

11   Amendment rights because online poker does not violate the IGBA.  Poker is

12   neither "gambling" under the IGBA definition, nor has ASC been directed by the

13   government to any state law that has supposedly been violated.  The IGBA

14   prohibits the conduct, financing, management, supervision, direction, or ownership

15   of an "illegal gambling business," which it further defines as a gambling business

16   in "violation of the law of a State or political subdivision in which it is conducted."

17   18 U.S.C. § 1955(a), (b)(1)(i).  The statute also defines "gambling" as including

18   "pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice

19   tables, and conducting lotteries, policy, bolita or numbers games, or selling

20   chances therein."  *Id.* § (b)(2).

21                    (i)    *Poker is a game of skill and is therefore not*

22                          *"gambling" under the IGBA*

23           Poker is not gambling under the IGBA's definition of the term because

24   poker is a game of skill.  First, whether an activity constitutes "gambling" under

25   the IGBA definition must be determined by considering the activities specified in

26   the statute and applying the interpretative canon *ejusdem generis* ("of the same

27   kind").  Under that canon of construction, "general terms that follow specific ones

28

11
**MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY**
**CASE NO.**

1   are interpreted to embrace only objects of the same kind of class as the specific

2   ones." *United States v. Amato*, 540 F.3d 153, 160 (2d Cir. 2008); *see also United*

3   *States v. Turkette*, 452 U.S. 576, 581 (1981) ("[W]here general words follow a

4   specific enumeration of persons or things, the general words should be limited to

5   persons or things similar to those specifically enumerated."). Poker, however, is

6   dissimilar from the activities specified in the statute in two crucial ways.

7   Abundant authority demonstrates that the specified activities are games of chance,

8   and are "banking" games that are played against the house. Poker, by contrast, is

9   neither a game of chance, nor is it played against the house: wagers are made

10   against other players and, as demonstrated below, differences in skill between the

11   players determine who wins and how much the winning player wins.

12          Second, as is true for similar games like golf, billiards, and bridge, when

13   good poker players play against poor players, they consistently beat them. Players

14   who enter golf and bridge tournaments pay a fee to enter, and earn a cash reward if

15   they win, but these games are contests of skill because their outcome is determined

16   principally by skill. *See Two Elec. Poker Game Machs.*, 502 Pa. at 195, 465 A.2d

17   at 977 ("[i]t cannot be disputed that football, baseball and golf require substantial

18   skill, training and finesse" even though "the result of each game turns in part upon

19   luck or chance"); *In re Allen*, 377 P.2d 280, 281 (Cal. 1962) (bridge requires skill

20   and is not a "game of chance"). So too with poker. To be sure, there is some

21   element of luck over the course of a poker match that will affect how individual

22   players perform. Nevertheless, the fact that every hand of poker involves multiple

23   decision points (at each of the multiple rounds of betting), multiple decisions at

24   each decision point (bet, call, raise, or fold), and innumerable factors that call for

25   skill to evaluate each of those decisions (for example, the player's own cards, the

26   odds of his hand improving, his sense of the strength of the other player's hand, his

27

28
                                              12

1    sense of the other players' perception of him), establishes that poker is a contest of
2    skill.

3          The essence of poker is correct decision-making.  The importance of
4    decision-making in poker cannot be understated: in a recent statistical analysis of
5    over 100 million actual poker hands, the players' decisions *alone*, rather than the
6    cards dealt, accounted for the result in 76% of all hands played, where all players
7    folded to a single winning player.  *See* Paco Hope et al., *Statistical Analysis of*
8    *Texas Hold'Em* at 7 (Jan. 28, 2009),[2] attached for the Court's convenience as
9    Exhibit 5.  Tellingly, of the 24% of hands that did play to a showdown, only 50%
10   of those – or 12% overall – were won by the player with the best five-card hand at
11   the table.  *Id*.  In order to make the right decisions consistently, poker players must
12   employ a range of skills over and above a prerequisite knowledge of odds.  To be
13   skilled at poker, players must develop an ability to directly influence the way an
14   individual hand turns out – who collects the pot at the end, and how much is in the
15   pot.  As one court recently held, "[s]uccessful players must possess intellectual and
16   psychological skills.  They must know the rules and the mathematical odds.  They
17   must know how to read their opponents' 'tells' and styles.  They must know when
18   to hold and fold and raise.  They must know how to manage their money."
19   *Pennsylvania v. Dent*, No. 2008-733, slip op. at 13-14 (Pa. Ct. Com. Pl. Jan. 14,
20   2009).

21         Of course, it is true that individual moves in poker are called "bets."  But
22   that vocabulary is misleading.  The "bet" is not a wager on a chance event.  Unlike
23   poker "bets," true wagers do not alter the outcome of the event.  A bet on the Super
24   Bowl does not change the score; bets at a blackjack table are made before the cards
25   are dealt; bets on roulette wheels are placed before the ball is dropped.  Bets at a

26

27   [2]      http://www.cigital.com/resources/gaming/poker/100M-Hand-AnalysisReport.pdf.

28                                          13

1    poker table are different.  What is called a "bet" in poker is really a "move" like a

2    move in any other game: it is a gambit designed to provoke a desired reaction from

3    an opponent.  A player is not betting on what cards his opponents holds – the

4    essence of gambling.  He is betting to influence what his opponents do – the

5    essence of strategy.

6    　　　　The conclusion that skill is required to win at poker has been further proven

7    by several recent studies.  In one game-theory study, for example, the author

8    demonstrated through the use of computer simulation that a combination of skills

9    is required in order to consistently win at poker.  *See Patrick Larkey et al., Skill in*

10   *Games*, 43 MANAGEMENT SCIENCE 596 (May 1997).  The author programmed

11   twelve different robots with varying degrees and types of skills, ranging from basic

12   knowledge of the rules to being able to calculate odds, learn about opponents, and

13   bluff; the robots were then pitted against each other in 100 one-on-one games.  *See*

14   *Id*.  Over the course of the tournament, the random-play robot won only 0.4% of its

15   games and lost $546,000.00, whereas the most sophisticated robot won 89% of the

16   hands it played and earned $432,000.00.  *See Id*. at 601, table 2.

17   　　　　Moreover, online poker involves additional special skills.  Online play

18   typically involves many more hands than an ordinary live poker match because

19   hands are dealt much faster, and many players play multiple tables simultaneously.

20   Whatever element of chance is involved in individual hands thus evens out as a

21   statistical matter more quickly than in live play.  Other aspects of online play also

22   contribute to the skill involved – for example, the large number of tables available

23   for play means that players can make strategic decisions about whom to play

24   against in the first place.  For all of these reasons, online poker requires specialized

25   skills that live play does not.

26

27

28

1                     *(ii)    There has been no demonstration that any*

2                          *applicable state law has been violated*

3       Despite purporting to act pursuant to the IGBA, the government has never

4 bothered to advise ASC as to the state law it supposedly violated.  It is certainly

5 true that California (the state where the funds were seized), and New York (the

6 state where the seizures were initiated) do not appear to prohibit online poker by

7 statute.  In general, almost all state statutes distinguish between games of chance

8 and games of skill: an activity is not gambling if skill predominates over chance or

9 is the material element in determining the outcome of the activity.  Many states

10 apply a "dominant factor" test, while others apply similar tests, like the material

11 element test.  *See, e.g., Indoor Recreation Enters., Inc. v. Douglas*, 235 N.W.2d

12 398, 400 (Neb. 1975); *In re Allen*, 377 P.2d 280 (Cal. 1962); *Las Vegas Hacienda,*

13 *Inc. v. Gibson*, 359 P.2d 85, 87 (Nev. 1961); *State v. Stroupe*, 76 S.E.2d 313, 316-

14 17 (N.C. 1953); *D'Orio v. Startup Candy Co.*, 266 P. 1037, 1038 (Utah 1928);

15 *Harris v. Missouri Gaming Comm'n*, 869 S.W.2d 58, 62 (Mo. 1994); 2001 Alas.

16 AG LEXIS 19, at *7 (2001); N.Y. Penal Law § 225.00(1).  In all states which

17 apply such a distinction, poker cannot be classified as gambling for the reasons

18 discussed above.

19       Indeed, a recent New York case indicates that the state bears the burden of

20 showing as a factual matter that a particular game is a game of chance.  *See People*

21 *v. Hua*, – N.Y.S.2d –, 2009 WL 1575188 (N.Y. City Crim. Ct. 2009).  The court

22 there held that a criminal information was invalid where it merely alleged, without

23 support, that mahjong, the game in issue, was a game of chance.  *Id.* at *4.  For the

24 reasons explained in this memorandum, a full evidentiary record would establish

25 that poker is not a game of chance.

26       Several other cases have recently recognized poker as a game of skill and

27 accordingly affirmed its exclusion from state statutes prohibiting gambling.  A

28

1  Pennsylvania court, for example, applied the dominant factor test and found that

2  hosting a poker game is not prohibited under Pennsylvania's criminal prohibition

3  on gambling. *See Pennsylvania v. Dent*, No. 2008-733, slip op. (Pa. Ct. Com. Pl.

4  Jan. 14, 2009); 18 PA. CONS. STAT. ANN. §§ 306(1)(i)(ii) & 5513. Specifically, the

5  court found that "Texas Hold'em poker is a game where skill predominates over

6  chance" and so is not unlawful gambling under the Crimes Code. *Id.* at 14.

7        Similarly, a Colorado defendant charged with illegal gambling after playing

8  Texas Hold'em was recently acquitted by a jury after presenting evidence that

9  poker is a game of skill. *See* Trevor Hughes, *Definition Clears Man of Gambling*

10  *Charges*, Coloradoan (Jan. 30, 2009). Colorado also prohibits gambling under

11  COLO. REV. STAT. § 18-10-102(2) & -103, but excludes from the definition of

12  gambling any "[b]ona fide contest[] of skill." *Id.* § 18-10-102(2)(a).

13        In California, case law suggests that a game like poker does not violate

14  applicable law. *See Bell Gardens Bicycle Club v. Department of Justice*, 36 Cal.

15  App. 4th 717, 748 (Cal. Ct. App. 1995) (noting that "the testimony unequivocally

16  showed that winning the Jackpot, unlike winning the poker pot *is based*

17  *predominantly upon chance not skill*.") (emphasis in original); *Score Family Fun*

18  *Ctr. v. County of San Diego*, 225 Cal. App. 3d 1217, 1222 (Cal. Ct. App. 1990)

19  (quoting expert testimony from *Commonwealth v. Two Electronic Poker Game*

20  *Machines*, 465 A.2d 973, 978 (Pa. 1983), for the proposition that skill used to play

21  electronic poker games "is not the same skill which can indeed determine the

22  outcome in a game of poker between human players" because holding, folding,

23  bluffing and raising play no role in electronic game). Accordingly, because online

24  poker is legal under the IGBA and counsel has not been directed to any state law

25  that has been violated, the government acted with callous disregard for ASC's

26  constitutional rights when it seized funds, without probable cause or, in the case of

27  the Union Bank accounts, a warrant, from the subject accounts.

28

**MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY**
**CASE NO.**

**2.** **ASC has an interest in the seized accounts and a need for the funds' return**

It is beyond dispute that ASC has an interest in the seized accounts: ASC owned the accounts, which consisted in large part of money held in trust by ASC for approximately 13,800 individual poker players, as well as operating funds, and a small amount of other funds unrelated to online poker. *See* Decl. of Douglas G. Rennick, attached as Exhibit 2. ASC owed each of those individual players a fiduciary duty, which it breached when checks issued by ASC, payable to the individual players, bounced as a result of this seizure. Notwithstanding the fact that some of the players may have been credited for their lost funds by the operators, ASC still has an interest in and a need for return of the money. In many cases, individual players cash their checks at check cashing businesses across the country; ASC is now liable to every one of those cash checking business that paid players for what were bad checks, and receives daily demands for reimbursement of the bounced checks. *See* Demand Letters, attached as Exhibit 8.[3] Therefore, ASC has a significant interest in the seized accounts and a need for their return.

**3.** **ASC will suffer irreparable injury if the property is not returned**

The government caused irreparable injury to ASC when it unlawfully seized the funds in ASC's Wells Fargo and Union Bank accounts. ASC was placed in an untenable position by the government when checks, payable to individual players for whom ASC held money in trust, bounced. Furthermore, as discussed above, ASC is now exposed to demands and threats of civil suit from check cashing businesses that cashed individual players' checks which subsequently bounced. In

---

[3]    Counsel has attached several demand letters representative of the hundreds ASC has received; the names of individuals to whom the checks were written have been redacted.

1  addition to ASC's continued exposure caused by the seizure, ASC's ability to

2  function as a business has been severely impaired and its survival is threatened by

3  the unlawful seizure; ASC will likely have to close its doors if the money seized is

4  not returned and the bank accounts are unavailable for operation of business. *See*

5  Decl. of Douglas G. Rennick, attached as Exhibit 2. ASC will therefore suffer

6  irreparable injury if the property seized is not returned.

        **4.**    **ASC presently possesses no adequate remedy at law**

7

8        A Motion for Return of Property under Rule 41(g) is ASC's only available

9  remedy because no civil forfeiture proceedings have been instituted, nor has a

10  criminal complaint been filed; ASC's funds were simply seized, in the case of the

11  Union Bank accounts, without even a warrant. As discussed above, Rule 41(g) is

12  the primary "vehicle for recovering seized but not forfeited property." *Turner v.*

13  *Gonzales*, No. 06-4020, 2007 WL 1302126, at *1 (C.A.7 (Ind.) May 3, 2007)

14  (citing *United States v. Sims*, 376 F.3d 705, 708 (7th Cir. 2004); *United States v.*

15  *Howell*, 354 F.3d 693, 695 (7th Cir. 2004)). The Ninth Circuit Court of Appeals

16  has specifically held that a motion for return of property is proper where there are

17  neither criminal proceedings nor civil forfeiture proceedings pending against the

18  movant. *See United States v. Baker*, No. CR-04-40054 SBA, 2007 WL 4259556,

19  at *1 (N.D. Cal. 2007); *United States v. U.S. Currency $83,310.78*, 851 F.2d 1231,

20  1235 (9th Cir. 1988). Because the government seized the funds in ASC's Wells

21  Fargo and Union Bank accounts but has not yet instituted civil forfeiture or

22  criminal proceedings against ASC, there is no adequate remedy for ASC at law.

23  **II.**    **The Government's Seizure and Continued Retention of Funds**

24          **from ASC's Wells Fargo Union Bank Accounts is Unreasonable**

25          **and the Funds Must be Returned**

26        The *Ramsden* court recognized that there is no precise test for determining

27  whether illegally seized property should be returned to the movant. *See Ramsden*,

28

1    2 F.3d at 326.  Nonetheless, the advisory notes explain that "reasonableness under

2    all the circumstances must be the test when a person seeks to obtain the return of

3    property."  Advisory Committee Notes to the 1979 Amendments to FED. R. CRIM.

4    P. 41(e).  The notes state further that "if the United States' legitimate interests can

5    be satisfied even if the property is returned, continued retention of the property

6    would become unreasonable."  *Id.*

7    　　　Here, continued retention of the funds from ASC's Wells Fargo and Union

8    Bank accounts would be patently unreasonable and this Court must therefore order

9    that the funds be returned.  As discussed above, the seizure violated ASC's Fourth

10   and Fifth Amendment rights: in the case of the Union Bank accounts, the funds

11   were simply seized without a warrant or notice.  Moreover, there no probable cause

12   on which to even obtain a warrant - or to support the Warrant of Seizure for the

13   Wells Fargo account - because: first, a payment processor cannot violate the

14   IGBA; second, the vast majority of funds seized belong to individual players who

15   most certainly cannot violate the IGBA; and third, there is overwhelming legal and

16   statistical evidence that online poker does not violate the IGBA.  The government

17   placed ASC in an untenable position when it exposed ASC to liability for checks

18   that have bounced as a result of the unlawful seizure.  Finally, any arguably

19   legitimate interest the government may have in retaining the funds could be

20   satisfied even if the funds are returned, because ASC maintains detailed records

21   regarding the money held in its account and the manner in which it is distributed.

22   The reasonableness test therefore dictates that this Court order the unlawfully

23   seized funds returned.

## CONCLUSION

25   　　　For the reasons set forth above, claimant respectfully requests that this Court

26   order the return of funds seized from Wells Fargo Bank, account number

27   7986104185, and from Union Bank, N.A., in accounts numbered 353000248 and

28

**MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY
CASE NO.**

1    353000256, pursuant to FED. R. CRIM. P. 41(g).  Alternatively, counsel requests

2    that this Court conduct an Evidentiary Hearing on the issues raised by this Motion.

3

4    DATED:      July 10, 2009              Respectfully submitted,

5

6                                          LAW OFFICES OF MICHAEL PANCER

7                                          By:    Michael Pancer

8

9

10                                         COZEN O'CONNOR

11

12                                         By:    L. Barrett Boss, *pending pro hac vice*
                                           Attorneys for Movant
13                                         Account Services Corporation

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY**
**CASE NO.**

# **DECLARATION OF COUNSEL**

I, Michael Pancer, hereby declare as follows:

1.    I am an attorney admitted to practice in the State of California and the Central District of California.  I represent movant Account Services Corporation in the above-entitled matter.

2.    Attached as Exhibit 1 is a true and correct copy of PokerStars End User License Agreement, accessed on June 23, 2009.

3.    Attached as Exhibit 2 is a true and correct copy of the declaration of Douglas G. Rennick, signed on or about July 10, 2009.

4.    Attached as Exhibit 3 is a true and correct copy of the Warrant of Seizure on All Funds on Deposit at Wells Fargo Bank, dated June 2, 2009.

5.    Attached as Exhibit 4 is a true and correct copy of the Letter of Manisha Merchant, Vice President and Senior Counsel of Union Bank, dated July 6, 2009.

6.    Attached as Exhibit 5 is a true and correct copy of the Letter of Lev L. Dassin, Acting United States Attorney for the Southern District of New York, dated June 12, 2009.

7.    Attached as Exhibit 6 is a true and correct copy of the Warrant of Seizure on All Funds on Deposit at Union Bank, dated June 24, 2009.

8.    Attached as Exhibit 7 is a true and correct copy of an article by Paco Hope et al., *Statistical Analysis of Texas Hold'Em* at 5 (Jan. 28, 2009), *available at* http://www.cigital.com/resources/gaming/poker/100M-Hand-AnalysisReport.pdf.

9.    Attached as Exhibit 8 is a true and correct copy of five demand letters pertaining to funds in the account at issue.

10.    After this matter's assignment to a district court, I will work with government counsel on a mutually agreeable hearing date and briefing schedule, consistent with the district court's calendar and procedures.

**MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY CASE NO.**

1       I declare under penalty of perjury that the foregoing is true and correct to the

2 best of my knowledge.  Executed July 10, 2009 at San Diego, California.

3

4                 Michael Pancer

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**MOTION OF ACCOUNT SERVICES CORP. FOR RETURN OF PROPERTY**
**CASE NO.**

**PROOF OF SERVICE**

I, LILIANA SOLORIO, do hereby state:

That I am a citizen of the United States, over the age of eighteen years, and not a party to the within action.

That my business address is 105 West F Street, 4th Floor, San Diego, California.

That on July 10, 2009, I deposited in the United States Mail, in San Diego, California, in the above-entitled action, in an envelope bearing the requisite postage a copy of the Notice of Motion and Motion for Return of Property, Memorandum of Points and Authorities, Declaration of Counsel and Exhibits in the above matter to the office of the following individuals:

Untied States Attorney General Eric Holder
U.S. Department of Justice
950 Pennsylvania Avenue
Washington D.C. 20530-0001

Karen P. Hewitt, Esq.
U.S. Attorney
Office of the United States Attorney
880 Front Street, Room 6293
San Diego, CA 92101

Lev L. Dassin
Acting United States Attorney
Arlo Devlin-Brown
Jeffrey Alberts
Assistant Untied States Attorneys
1 St. Andrews Plaza
New York, New York 10007

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 10th day of July, 2009, at San Diego, California.

Liliana Solorio

## EXHIBITS TO MOTION OF ACCOUNT SERVICES CORPORATION FOR RETURN OF PROPERTY

# TABLE OF CONTENTS

**Page**

**Exhibit 1**: PokerStars End User Agreement............................................................ 1

**Exhibit 2**: Declaration of Douglas G. Rennick (July 10, 2009)..... ..................12

**Exhibit 3**: Warrant of Seizure on All Funds on Deposit at Wells Fargo Bank....13

**Exhibit 4**: Letter of Manisha Merchant (July 6, 2009)...............................15

**Exhibit 5**: Letter of Lev L. Dassin (June 12, 2009) ..................................16

**Exhibit 6**: Warrant of Seizure on All Funds on Deposit at Union Bank...........17

**Exhibit 7**: Paco Hope et al., *Statistical Analysis of Texas Hold'Em* ...............20

**Exhibit 8**: Demand Letters..................................................................36

This end user license agreement (the "Agreement") should be read by you (the "User" or "you") in its entirety prior to your use of PokerStars' service or products. Please note that the Agreement constitutes a legally binding agreement between you and Rational Entertainment Enterprises Limited (referred to herein as "PokerStars", "us" or "we") which owns and operates the Internet site found at www.pokerstars.com (the "Site"). In addition to the terms and conditions of this Agreement, please review our Privacy Policy, the Poker Rules, and the VIP Club terms and conditions as well as the other rules, policies and terms and conditions relating to the games and promotions available on the Site as posted on the Site from time to time, which are incorporated herein by reference, together with such other policies of which you may be notified of by us from time to time.

By clicking the "I Agree" button below as part of the software installation process and using the Software (as defined below), you consent to the terms and conditions set forth in this Agreement, the Privacy Policy and the Poker Rules as each may be updated or modified from time to time in accordance with the provisions below and therein.

## 1. GRANT OF LICENSE/INTELLECTUAL PROPERTY

1.1. Subject to the terms and conditions contained herein PokerStars grants the User a non-exclusive, personal, non-transferable right to install and use the PokerStars poker software ("Software") in order to access the PokerStars servers and play the poker games (the "Games") available (the Software and Games together being the "Service").

1.2. The Software is licensed to you by PokerStars for your private personal use. Please note that the Software is not for use by (i) individuals under 18 years of age, (ii) individuals under the legal age of majority in their jurisdiction and (iii) individuals connecting to the Site from jurisdictions from which it is illegal to do so. PokerStars is not able to verify the legality of the Service in each jurisdiction and it is the User's responsibility to verify such matter.

1.3. We reserve the right at any time to request from you evidence of age in order to ensure that minors are not using the Service. We further reserve the right to suspend or cancel your account and exclude you, temporarily or permanently, from using the Service if satisfactory proof of age is not provided or if we suspect that you are underage.



Exhibit 1  Page 1

1.4. The Software's code, structure and organisation are protected by copyright, trade secrets, intellectual property and other rights. You may not:

(a) copy, distribute, publish, reverse engineer, decompile, disassemble, modify, or translate the Software or make any attempt to access the source code to create derivate works of the source code of the Software, or otherwise;

(b) sell, assign, sublicense, transfer, distribute or lease the Software;

(c) make the Software available to any third party through a computer network or otherwise;

(d) export the Software to any country (whether by physical or electronic means);

without the prior written consent of PokerStars; or

(e) use the Software in a manner prohibited by applicable laws or regulations,

(each of the above is an "Unauthorised Use").

You will be solely liable for any damage, costs or expenses arising out of or in connection with the commission by you of any Unauthorised Use. You shall notify PokerStars immediately upon becoming aware of the commission by any person of any Unauthorised Use and shall provide PokerStars with reasonable assistance with any investigations it conducts in light of the information provided by you in this respect.

1.5. The terms "PokerStars", and any other trade marks, service marks and/or trade names used by PokerStars on the Site from time to time (the "Trade Marks"), are the trade marks, service marks and/or trade names of PokerStars or one of its group companies and/or its licensors, and these entities reserve all rights to such Trade Marks. In addition, other content on the Site, including, but not limited to, the Software, images, pictures, graphics, photographs, animations, videos, music, audio and text (the "Site Content") belongs to PokerStars or one of its group

Exhibit 1 Page 2

2

companies and/or its licensors and is protected by copyright and/or other intellectual property or other rights. You hereby acknowledge that by using the Service and the Site you obtain no rights in the Site Content, or any part thereof. Under no circumstances may you use the Site Content without PokerStars' prior written consent.

## 2. NO WARRANTIES.

2.1. PokerStars disclaims any and all warranties, expressed or implied, in connection with the Service which is provided to you "AS IS" and we provide you with no warranty or representation whatsoever regarding its quality, fitness for purpose, completeness or accuracy.

2.2. Regardless of our efforts to provide you with service of the highest quality, safety and security, we make no warranty that the Service will be uninterrupted, timely or error-free, that defects will be corrected or that the services found therein shall be free from viruses or bugs.

2.3. PokerStars reserves the right to suspend, discontinue, modify, remove or add to the Service in its absolute discretion with immediate effect and without an obligation to provide you with notice and we shall not be liable in any way whatsoever for any loss suffered as a consequence of any decision made by PokerStars in this regard.

## 3. AUTHORITY

PokerStars retains authority over the issuing, maintenance, and closing of Users' accounts at PokerStars. The decision of PokerStars' management, as regards any aspect of a User's account, use of the Service, or dispute resolution, is final and shall not be open to review or appeal.

## 4. YOUR REPRESENTATIONS AND WARRANTIES

Prior to your use of the Service and on an ongoing basis you represent, warrant, covenant and agree that:

Exhibit 1 Page 3

3.

4.1. You acknowledge that there is a risk of losing money when using the Service and that PokerStars has no responsibility to you for any such loss.

4.2. You agree that your use of the Service is at your sole option, discretion and risk.

4.3. You agree that you are required to provide us with certain personal details about yourself (including details regarding your methods of payment) for the purpose of using the Service. Our control of the information provided by you shall be subject to our Privacy Policy.

4.4. You are solely responsible for any applicable taxes which may be payable on winnings paid to you.

4.5. You are solely responsible for the telecommunications networks and Internet access services required for you to access and use the Service and we shall have no liability whatsoever for any deficiencies therein.

## 5. PROHIBITED USES

5.1. SOFTWARE MODIFICATIONS. User may not attempt to modify, decompile, reverse-engineer or disassemble the Software in any way.

5.2. PERSONAL USE. The Service is intended solely for the User's personal use. The User is only allowed to wager for his/her personal entertainment. Under no circumstances shall a User be permitted to use his/her "real money account" with PokerStars for any purpose other than for using the Service. The User must provide full and truthful information in respect of all details and information provided by the User to PokerStars and the User is obligated to update such details in the event of any change thereto. A User may only have one account with PokerStars and shall only use the Service using such single account. Furthermore a User shall not permit another person to use the Service via his account.

5.3. REAL MONEY TRANSFERS. The PokerStars real money transfer facility is accessed via the "PokerStars Lobby" (under the heading "requests" and then "transfer funds"). Users must enter the amount to transfer and the player ID of the intended recipient. Users are reminded that

Exhibit 1 Page 4

4

it is their responsibility to ensure they know who the other Users are before entering into these arrangements. Limits on transfers will be set by PokerStars per User.

As part of PokerStars' licensing agreement and in compliance with anti money laundering legislation, Users need to be aware they may be required to produce personal documentation (such as Government issued ID, bank statements and utility bills) upon request in order for their transfer to be processed. This allows PokerStars to help protect the Users and prevent PokerStars being used as a vehicle for money laundering or fraud.

The following terms and conditions also apply to the real money transfer facility:

(a) PokerStars reserves the right to decline any account transfer requests or to overturn any account transfer upon suspicion of breach of any of the terms of this Agreement by the sender or receiver.

(b) A sending User agrees that they may only make an account transfer to enable a receiving User to play the Games and not for any other purpose.

(c) A receiving User agrees that they may only use the funds from an account transfer to play the Games and not for any other purpose.

(d) Users cannot cash out funds directly received from a transfer, (refer to sub-paragraph (c) above); winnings arising from playing the Games using the transferred funds that subsequently contribute to a cash out request will be reviewed in accordance with PokerStars' internal controls, policies and procedures.

5.4. COLLUSION. Collusion between Users by sharing hole cards or by any other methods is strictly forbidden. PokerStars reserves the right, in addition to other measures, to restrict seating and/or to prohibit Users from playing at a particular poker table or in a tournament, including restricting two or more Users from playing together at the same table or in the same tournament. In addition, PokerStars reserves the right to consider any collusion between players (including Users) as a material breach of this Agreement and accordingly PokerStars shall have the right to terminate a User's account if a User engages or attempts to engage in any such activity, regardless of the outcome of such attempt.

Exhibit 1 Page 5
5

5.5. EXTERNAL PLAYER ASSISTANCE PROGRAMS (EPA). PokerStars prohibits those External Player Assistance Programs ("EPA Programs") which are designed to provide an "Unfair Advantage" to players. PokerStars defines "External" to mean computer software (other than the Software), and non-software-based databases or profiles (e.g. web sites and subscription services). PokerStars defines an "Unfair Advantage" as any instance in which a User accesses or compiles information on other players beyond that which the User has personally observed through the User's own game play. We encourage you to read our Prohibited Online Software FAQ.

5.6. AUTOMATIC PLAYERS (BOTS). The use of artificial intelligence including, without limitation, "robots" is strictly forbidden in connection with the Service. All actions taken in relation to the Service by a User must be executed personally by players through the user interface accessible by use of the Software.

5.7. You agree that PokerStars may take steps to detect and prevent the use of prohibited EPA Programs. These steps may include, but are not limited to, examination of software programs running concurrently with the PokerStars Software on the User's computer.

5.8. CHIP-DUMPING. Chip-dumping occurs when any User intentionally loses a hand in order to deliberately transfer his chips to another User. Any User who chip-dumps or attempts to chip-dump with any other User while using the Service may be permanently banned from using the Service and their account may be terminated immediately. In such circumstances PokerStars will be under no obligation to refund to you any monies that may be in your PokerStars account at such time.

5.9. FRAUDULENT BEHAVIOR. In the event that PokerStars deems that a User has engaged or attempted to engage in fraudulent, unlawful, dishonest or improper activity while using the Service, including without limitation, engaging in any of the activities set forth above or any other game manipulation, or the making of any fraudulent payment, including without limitation, use of a stolen credit card or fraudulent chargeback or money laundering, PokerStars shall be entitled to take such action as it sees fit, including immediately blocking access to the Service, terminating such User's account with PokerStars, seizing all monies held in the User's PokerStars account, disclosing such information (including the identity of the User) to financial institutions, relevant authorities and/or any person or entity that has the legal right to such information, and/or taking legal action against such User.

Exhibit 1 Page 6

6

## 6. OFFENSIVE LANGUAGE OR CONTENT

The User is prohibited from posting any unlawful, obscene, libelous, defamatory, threatening, or other material that would violate any law or generally be considered to be offensive, via the Service using the chat option, the player images option or in correspondence with PokerStars' staff.

When using the chat option offered to Users via the Service, Users are prohibited from making any statements which promote any service or product of any party except PokerStars. Further, Users shall not make statements about PokerStars or the Service that are untrue or would reasonably be considered to be derogatory or critical.

## 7. BREACH

7.1. Without prejudice to any other rights, if a User breaches in whole or in part any provision contained herein, PokerStars reserves the right to take such action as it sees fit, including terminating this Agreement, immediately blocking access to the Service to such User, terminating such User's account with PokerStars, seizing all monies held in the relevant PokerStars account and/or taking legal action against such User.

7.2. You agree to fully indemnify, defend and hold harmless PokerStars and its shareholders, directors and employees from and against all claims, demands, liabilities, damages, losses, costs and expenses, including legal fees and any other charges whatsoever, howsoever caused, that may arise as a result of:

7.2.1. your breach of this Agreement, in whole or in part;

7.2.2. violation by you of any law or any third party rights; and

7.2.3. use by you of the Service or use by any other person accessing the Service using your Login Credentials (as defined below), whether or not with your authorization.

Exhibit 1 Page 7

8. LIMITATION OF LIABILITY. Under no circumstances, including negligence, shall PokerStars be liable for any special, incidental, direct, indirect or consequential damages whatsoever (including, without limitation, damages for loss of business profits, business interruption, loss of business information, or any other pecuniary loss) arising out of the use (or misuse) of the Service even if PokerStars had prior knowledge of the possibility of such damages.

## 9. SECURITY AND YOUR ACCOUNT.

9.1. Each User account shall be accessible through the use of a combination of a unique User ID ("User ID"), a unique and secret password ("Password"), and other optional numeric authentication methods that the User may select (the User ID, Password and any other authentication features together being referred to as the "Login Credentials"). The User is obligated to choose his/her own User ID and Password in accordance with the rules relating thereto.

9.2. The User agrees that he/she is solely responsible for all use of the Service under his/her Login Credentials and that he/she shall not disclose the Login Credentials to any person whatsoever.

9.3. The User is obliged to keep his/her Login Credentials secret and confidential at all times and to take all efforts to protect their secrecy and confidentiality. Any unauthorized use of the Login Credentials shall be the sole responsibility of the User and be deemed as his/her use. Any liability there from shall be that of the User.

9.4. Please note that monies held in your PokerStars account do not accrue interest.

9.5. You will not be able to place any bets using the Service in an amount greater than the total amount of money in your PokerStars account.

9.6. You are fully responsible for paying all monies owed to PokerStars. You agree not to make any chargebacks, and/or deny or reverse any payment made by you in respect of the Service. You will reimburse PokerStars for any chargebacks, denial or reversal of payments you make and any loss suffered by us as a consequence.

Exhibit 1 Page 8
8

9.7. PokerStars reserves the right to run credit and/or identity checks on a User, with third party credit agencies or services, using the information provided to us by a User on registration with the Service. The third party credit agencies or services may retain a record of the information but they will not use the information for any other purpose.

9.8. PokerStars reserves the right to use third party electronic payment processors and/or financial institutions to process payments made by and to you in connection with your use of the Service.

9.9. You acknowledge and agree that monies deposited by you in your PokerStars account are held in a trust account on your behalf.

10. OTHER

This product includes software developed by the OpenSSL Project for use in the OpenSSL Toolkit (http://www.openssl.org).

11. DISPUTES

The User accepts that the historical data of each game shall be as recorded on the PokerStars servers. In the event of a discrepancy between the cards displayed on your computer and the game records on the PokerStars' server the latter shall prevail. The User accepts that the "Instant Hand History" feature of the Software shall not be considered as the official historical record of any hand.

12. AMENDMENT

PokerStars reserves the right to update or modify this Agreement or any part thereof at any time without notice and you will be bound by such amended Agreement within 14 days of it being posted at the Site. Therefore, we encourage you to visit the Site regularly and check the terms

Exhibit 1 Page 9
9

and conditions contained in the version of the Agreement in force at such time. Your continued use of the Site shall be deemed to attest to your agreement to any amendments to the Agreement.

## 13. GOVERNING LAW

The Agreement and any matters relating hereto shall be governed by, and construed in accordance with, the laws of the Isle of Man. Each party irrevocably agrees that the relevant courts of the Isle of Man shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Agreement and any matter arising therefrom and irrevocably waives any right that it may have to object to an action being brought in those courts, or to claim that the action has been brought in an inconvenient forum, or that those courts do not have jurisdiction.

## 14. SEVERABILITY

If a provision of this Agreement is or becomes illegal, invalid or unenforceable in any jurisdiction, that shall not affect the validity or enforceability in that jurisdiction of any other provision hereof or the validity or enforceability in other jurisdictions of that or any other provision hereof.

## 15. ASSIGNMENT

PokerStars reserves the right to assign this agreement, in whole or in part, at any time without notice. The User may not assign any of his/her rights or obligations under this Agreement.

## 16. MISCELLANEOUS

16.1. No waiver by PokerStars of any breach of any provision of this Agreement (including the failure of PokerStars to require strict and literal performance of or compliance with any provision of this Agreement) shall in any way be construed as a waiver of any subsequent breach of such provision or of any breach of any other provision of this Agreement.

Exhibit 1  Page 10

16.2. Nothing in this Agreement shall create or confer any rights or other benefits in favour of any third parties not party to this Agreement.

16.3. Nothing in this Agreement shall create or be deemed to create a partnership, agency, trust arrangement, fiduciary relationship or joint venture between you and us.

16.4. This Agreement constitutes the entire understanding and agreement between you and us regarding the Service and supersedes any prior agreement, understanding, or arrangement between you and us.

16.5. The User must provide full and truthful information in respect of all details and information requested by PokerStars in connection with the User's use of the Service subject at all time to the terms of the Privacy Policy.

16.6. The English language version of this Agreement shall be the prevailing version in the event of any discrepancy between any translated versions of this Agreement.

Exhibit I  Page 11

## DECLARATION OF DOUGLAS G. RENNICK, PRESIDENT OF ACCOUNT SERVICES CORP.

I, Douglas G. Rennick, do hereby state:

1.  As the owner of the seized bank accounts listed below, Account Services has a possessory interest in the funds contained in these accounts. The seized accounts include:

    - Wells Fargo Bank Account Number: 7986104185, opened and maintained through Wells Fargo Business Banking, located at 444 S. Escondido Boulevard, Escondido, California, and which held approximately $18 to $20 million.
    - Union Bank Account Number: 3530000248
    - Union Bank Account Number: 3530000256, both of which were opened and maintained at the San Diego Main Branch, located at 1201 Fifth Avenue, San Diego, California, and which held, together with the account ending in 248, over $1 million.

2.  Account Services Corporation is a Delaware corporation. The company has a business address of 402 West Broadway, Suite 1760, San Diego, CA, 92101. It has been operating continuously for over two years. The company's primary business involves the processing of checks for individuals who have played online poker.

3.  Without access to the funds contained in these accounts, Account Services cannot satisfy its daily contractual obligations to facilitate the transfer of payments, and will suffer a substantial hardship and be forced out of business.

I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10 of July, 2009.


_____
Douglas G. Rennick, President
Account Services Corporation


**Exhibit 2 Page 12**

06/02/2009  5:24PM

**09 MAG  1320** ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - x
                          :
UNITED STATES OF AMERICA  :
                          :
        - v. -            :       WARRANT OF SEIZURE IN REM
                          :       PURSUANT TO 18 U.S.C. §§ 981,
ALL FUNDS ON DEPOSIT AT   :       984 & 1955
WELLS FARGO BANK IN SAN   :       09
FRANCISCO, CALIFORNIA, IN :       00 Mag. No.
ACCOUNT NUMBER 7986104185,:
HELD IN THE NAME OF ACCOUNT:
SERVICES INC., AND ALL    :
PROPERTY TRACEABLE THERETO,:
                          :
        Defendant in rem. :
                          :
- - - - - - - - - - - - - x

## WARRANT OF SEIZURE

TO:  ANY DEPUTY UNITED STATES MARSHAL OR ANY OTHER LAW
     ENFORCEMENT OFFICER AUTHORIZED BY LAW

        An Affidavit having been made before me by Dana Conte,

a Special Agent of the Federal Bureau of Investigation ("FBI"),

that he has reason to believe that the funds specified in the

above-captioned bank account are subject to seizure and civil

forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), 981(b),

984, and 1955 and as I am satisfied that there is probable cause

to believe that the property so described is subject to seizure

and civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and

(C), 981(b), 984, and 1955,

        YOU ARE HEREBY COMMANDED AND AUTHORIZED to seize,

within ten (10) days of the date of issuance of this warrant, by

Exhibit 3 Page 13

1009081831580905

06/02/2009  5:24PM

serving a copy of this warrant of seizure, upon the custodian of the bank account, if any, the funds described as follows:

> ALL FUNDS ON DEPOSIT AT WELLS FARGO BANK IN SAN FRANCISCO, CALIFORNIA, IN ACCOUNT NUMBER 7986104185, HELD IN THE NAME OF ACCOUNT SERVICES INC.

YOU ARE FURTHER COMMANDED AND AUTHORIZED to prepare a written inventory of the property seized and promptly return this warrant and inventory before this Court as required by law.

WELLS FARGO BANK IS HEREBY COMMANDED to effect the seizure of the contents of the above-referenced accounts and to refuse the withdrawal of any amount from said accounts by anyone other than duly authorized law enforcement agents, promptly to provide law enforcement officers with the current account balance, and continue to accrue any deposits, interest, dividends, and any other amount credited to said account until the aforementioned law enforcement agents direct that the contents of said account be finally liquidated.

Dated: New York, New York
    June 2, 2009

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

2



LEGAL DIVISION

July 6, 2009

**Via E-mail and U.S. Mail**                                    **E-mail: burgesslaw@sbcglobal.net**
Leonard H. Burgess, Esq.
Law Offices of Leonard H. Burgess
402 West Broadway, Suite 1760
San Diego, CA 92101

    Re:    *Seizure of Accounts 353000248 and 353000256 i/n/o Account Services Corp.*
        Your Client:      Account Services Corp.

Dear Mr. Burgess:

I am in receipt of your letter dated July 2, 2009 to Mr. Jon Nakamura and am responding on behalf of Union Bank, N.A ("Union Bank").

Union Bank took proper action to restrain your client's above referenced accounts. Under permissible legal authority granted and asserted by the U.S. Department of Justice ("DOJ") under 18 USC §§ 981(a)(1)(c) and (b)(2)(B)(ii), property subject to forfeiture can be seized without a warrant if there is probable cause and an exception to the Fourth Amendment. (See, also, *United States v. Dacarett* (1993) 6 F.3d 37.) In one of just many cases after *Dacarett* entitled, *Organizacion JD LTDA v. US Dept of Justice* (1994) 18 F.3d 91, the US Court of Appeals, 2nd Cir., citing Daccarett said, ***"[p]roperty can be seized and subjected to civil forfeiture, without providing preseizure notice and opportunity to be heard, if exigent circumstances are present,"*** which the DOJ pre-seizure demand and authority supports. (Emphasis added.)

The DOJ's reliance on exigent circumstances, as an exception to the Fourth Amendment, permits the subject property to be held while an application for seizure warrant is being processed. Accordingly, Union Bank had no alternative but to comply.

Furthermore, Union Bank was duly served with a "Warrant of Seizure *In Rem* Pursuant To 18 USC §§ 981, 984 & 1955."

For the reasons stated, the DOJ had valid legal grounds to request the Bank's compliance and Union Bank took proper action accordingly to restrain your client's above referenced accounts.

If you have any further questions, please contact me directly at (213) 236-6983 to further discuss this matter.

                  Sincerely,

                  Manisha Merchant
                  Vice President & Senior Counsel

Exhibit 4  Page 15

CARE

445 SOUTH FIGUEROA STREET, LOS ANGELES, CALIFORNIA 90071-1602

213 236 5477    FAX 213 627 1819                    CUSTOMERS ARE THE REASON WE EXIST



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

June 12, 2009

By Email
John McCarthy, CAMS
SVP & Sr. Manager, Financial Intelligence Unit
Union Bank, N.A.
(415) 765-2104

    Re:    Accounts 3530000248 and 3530000256

To Whom It May Concern:

    Pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 984, the Government has probable cause to believe that the funds in the accounts listed above are subject to seizure and forfeiture to the United States because they constitute the proceeds of specified unlawful activities.

    Given the nature of the property in question, exigent circumstances require that the funds be frozen immediately to prevent them from being dissipated. See United States v. Daccarett, 6 F.3d 37 (2d Cir. 1993). We have initiated the process of obtaining a seizure warrant for the funds from the Court. Until we obtain the warrant, you are requested to freeze funds in this account. Should any attempt be made to withdraw funds from the account, please notify my office immediately. Upon the issuance of the seizure warrant, we will provide you with a copy thereof. Until such time as you hear from this Office, the property should remain frozen and should not be released to anyone, but the Office requests that you permit the accounts to continue to accrue any deposits, interest, dividends, and any other amount credited to said accounts.

    If you have any questions concerning this matter, please contact any of us at the numbers provided below.

                        Respectfully,

                        LEV L. DASSIN
                        Acting United States Attorney

By:
                        Jeff Alberts
                        Arlo Devlin-Brown
                        Jonathan New
                        Assistant United States Attorneys
                        Tel: (212) 637-1038/2506/1049

**Exhibit 5  Page 16**

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :

        -v.-                     :

ALL FUNDS ON DEPOSIT AT         :
UNION BANK IN SAN FRANCISCO,    :
CALIFORNIA, IN ACCOUNT
NUMBER 3530000248 HELD IN       :
THE NAME OF ACCOUNT SERVICES
CORP.;                          :

ALL FUNDS ON DEPOSIT AT         :
UNION BANK IN SAN FRANCISCO,
CALIFORNIA, IN ACCOUNT          :
NUMBER 3530000256 HELD IN
THE NAME OF ACCOUNT SERVICES    :
CORP.;
                                :
AND ALL PROPERTY TRACEABLE
THERETO,                        :

        Defendants in rem.      :
- - - - - - - - - - - - - - - - x

**09 MAG   1496**

WARRANT OF SEIZURE IN REM
PURSUANT TO 18 U.S.C. §§ 981,
984 & 1955

09 Mag. No.

## WARRANT OF SEIZURE

TO:   ANY DEPUTY UNITED STATES MARSHAL OR ANY OTHER LAW
      ENFORCEMENT OFFICER AUTHORIZED BY LAW

        An Affidavit having been made before me by Dana Conte,

a Special Agent of the Federal Bureau of Investigation ("FBI"),

that she has reason to believe that the funds specified in the

above-captioned bank account are subject to seizure and civil

forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), 981(b),

984, and 1955 and as I am satisfied that there is probable cause

to believe that the property so described is subject to seizure

Exhibit 6  Page 17

and civil forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and

(C), 981(b), 984, and 1955,

YOU ARE HEREBY COMMANDED AND AUTHORIZED to seize,

within ten (10) days of the date of issuance of this warrant, by

serving a copy of this warrant of seizure, upon the custodian of

the bank account, if any, the funds described as follows:

ALL FUNDS ON DEPOSIT AT UNION BANK IN SAN FRANCISCO,
CALIFORNIA, IN ACCOUNT NUMBER 3530000248 HELD IN THE
NAME OF ACCOUNT SERVICES CORP.; and

ALL FUNDS ON DEPOSIT AT UNION BANK IN SAN FRANCISCO,
CALIFORNIA, IN ACCOUNT NUMBER 3530000256 HELD IN THE
NAME OF ACCOUNT SERVICES CORP.

YOU ARE FURTHER COMMANDED AND AUTHORIZED to prepare a

written inventory of the property seized and promptly return this

warrant and inventory before this Court as required by law.

FIFTH THIRD BANK IS HEREBY COMMANDED to effect the

seizure of the contents of the above-referenced accounts and to

refuse the withdrawal of any amount from said accounts by anyone

other than duly authorized law enforcement agents, promptly to

provide law enforcement officers with the current account

balance, and continue to accrue any deposits, interest,

dividends, and any other amount credited to said account until

2

Exhibit 6  Page 18

the aforementioned law enforcement agents direct that the

contents of said account be finally liquidated.

Dated: New York, New York
       June 24, 2009

                                                    _____
                   JUN 2 4 2009    HONORABLE HENRY B. PITMAN
                                   UNITED STATES MAGISTRATE JUDGE
                                   SOUTHERN DISTRICT OF NEW YORK

3

Exhibit 6  Page 19



cigital

# Statistical Analysis of Texas Hold'Em

March 4, 2009

Mr. Paco Hope
Technical Manager
Cigital, Inc.

Mr. Sean McCulloch, PhD
Associate Professor
Department of Mathematics and Computer Science
Ohio Wesleyan University

Page 1 of 16

Exhibit 7 Page 20

Proprietary Statement

Copyright © 2009 by Cigital®, Inc. and Rational Entertainment En-
terprises Limited (REEL). All rights reserved. No part or parts of
this document may be reproduced, translated, stored in any elec-
tronic retrieval system, transmitted in any form or by any means,
electronic, mechanical, photocopying, recording or otherwise,
without permission of the copyright owner.

Cigital, Inc. makes no representations or warranties, express or im-
plied, with respect to the documentation and shall not be liable for
any damages, including any indirect, incidental, consequential
damages (such as loss of profit, loss of use of assets, loss of business
opportunity, loss of data or claims for or on behalf of user's cus-
tomers), that may be suffered by the user.

Cigital, Inc. and the Cigital, Inc. logo are trademarks of Cigital, Inc.
Other brands and products are trademarks of their respective
owner(s).


Cigital, Inc.

21351 Ridgetop Circle
Suite 400
Dulles, VA 20166
Phone: + 1 (703) 404-9293

www.cigital.com


This work was performed under contract to:

Rational Entertainment Enterprises Limited (REEL)

Douglas Bay Complex, Onchan

Isle of Man

Exhibit 7  Page 21

Copyright © 2009 Cigital, Inc. All Rights Reserved.

# Table of Contents

List of Figures ............................................................................................................... 4
List of Tables ................................................................................................................ 4
1  Executive Summary ................................................................................................ 5
2  Goals and Methodology ......................................................................................... 5
   2.1      Data Acquisition ............................................................................................. 5
   2.2      Data Analysis ................................................................................................. 7
          2.2.1   Showdown Determination ............................................................. 7
          2.2.2   Best Hand Win Determination ....................................................... 7
   2.3      Statistical Method ........................................................................................... 8
          2.3.1   Description of the analysis ............................................................ 8
          2.3.2   Assumptions and possible sources of error ................................ 10
   2.4      Verifying Log Data ....................................................................................... 11
          2.4.1   Rationale ..................................................................................... 11
          2.4.2   Mechanics .................................................................................. 11
          2.4.3   Results ........................................................................................ 12
3  Findings ................................................................................................................ 12
   3.1      Margin of Error ............................................................................................. 12
4  Conclusion ........................................................................................................... 14
5  Recorded Artifacts .............................................................................................. 15
   5.1      PokerStars Log Files .................................................................................... 15
   5.2      Player-submitted Hand Histories .................................................................. 15
For More Information ................................................................................................... 16
About Cigital, Inc. ........................................................................................................ 16

Exhibit 7  Page 22

Copyright © 2009 Cigital, Inc. All Rights Reserved.

# List of Figures

Figure 1: Standard Bell Curve ............................................................... 13

# List of Tables

Table 1: Example Log Data ................................................................. 6
Table 2: Contact Information ............................................................. 16

### Note to the Reader

This document is written to a technical audience. It is assumed that the reader is acquainted with common poker terminology (flop, river, hole cards, board, etc.) It is further assumed that the reader understands the basic mechanics of playing Texas Hold 'Em. This document also uses standard poker notation such as K♦4♣Q♦2♠J♥ or 5c5hKcTd8d to represent hands.

Exhibit 7  Page 23

Copyright © 2009 Cigital, Inc. All Rights Reserved.

# 1    Executive Summary

The effect of luck (i.e., the dealing of the cards) in Texas Hold'Em is a subject of much debate in the legal community. This study seeks to establish clear numbers derived from a significant sample of actual play. This study does not quantify the effect that luck has on Texas Hold'Em, but it provides compelling statistics about the way that the outcomes of games are largely determined by players' decisions rather than chance.

Cigital examined 103 million hands of Texas Hold'Em poker played at PokerStars. In the majority of cases, 75.7% of the time, the game's outcome is determined with no player seeing more than his/her own cards and some or all of the community cards. In these games all players fold to a single remaining player who wins the pot. In the 24.3% of cases that see a showdown (where cards are revealed to determine a winner), only 50.3% of showdowns are won by the player who could make the best 5-card hand. The other roughly half of the showdowns are won by someone with an inferior 5-card hand because the player with the best 5-card hand folded prior to showdown.

We use accepted statistical sampling formulas to make the argument that these statistics are generally representative of Texas Hold'Em in Section 2. The findings themselves are presented in Section 3. In order that the artifacts can be reused with confidence, the cryptographic signatures of all contributing data are listed in Section 5.

# 2    Goals and Methodology

The purpose of this analysis is to determine certain statistical qualities of the game of Texas Hold 'Em as played at PokerStars.com. Given the specific results from analyzing PokerStars.com, we want to generalize the results and say mathematically that they represent the game of Texas Hold 'Em as a whole. It is important that Cigital conduct this analysis independently and without predisposition towards the final outcome.

## 2.1    Data Acquisition

Cigital acquired data from Rational Entertainment Enterprises Limited (REEL) related to play at PokerStars.com. The log files are ar-

Exhibit 7  Page 24

Copyright © 2009 Cigital, Inc. and REEL. All Rights Reserved

chived by Cigital and their SHA-1 signatures are recorded in Section 5. The log files contain descriptions of the play of many hands. Table 1 shows two groups of log file lines that describe two different games. Note that user IDs have been changed and the hand IDs are fictitious to protect the confidentiality of this data.

| Game | Blind | Bet | Hand ID | Board | User ID | Pos | Win | Hole | Best Hand | Show |
|------|-------|-----|---------|-------|---------|-----|-----|------|-----------|------|
| No Limit | 100 | 200 | 1399167686 | 8dKcTd9sQd | Player A | 0 | 0 | KsQh | KsKcQhQdTd | 1 |
| No Limit | 100 | 200 | 1399167686 | | Player B | 1 | 0 | 2s7s | 7s2s | 0 |
| No Limit | 100 | 200 | 1399167686 | 8dKcTd9sQd | Player C | 2 | 1 | 4d5d | QdTd8d5d4d | 1 |
| No Limit | 100 | 200 | 1399167686 | | Player D | 3 | 0 | Qc8s | Qc8s | 0 |
| No Limit | 100 | 200 | 1399167686 | | Player E | 4 | 0 | 5c5h | 5c5hKcTd8d | 0 |
| No Limit | 100 | 200 | 1399167686 | | Player F | 5 | 0 | Tc2d | Tc2d | 0 |
| No Limit | 100 | 200 | 1399167686 | | Player G | 6 | 0 | AsKh | KhKcAsTd8d | 0 |
| No Limit | 100 | 200 | 1399167686 | | Player H | 7 | 0 | 3h2c | 3h2c | 0 |
| No Limit | 100 | 200 | 1399167686 | | Player I | 8 | 0 | Ah6h | Ah6h | 0 |
| No Limit | 10 | 25 | 1299170765 | | Player A | 0 | 0 | 5cQs | 5c5sAdQsJh | 0 |
| No Limit | 10 | 25 | 1299170765 | 9s2d5sAdJh | Player B | 1 | 1 | 2hTh | 2h2dAdJhTh | 0 |
| No Limit | 10 | 25 | 1299170765 | | Player C | 2 | 0 | 6c3c | 6c3c | 0 |
| No Limit | 10 | 25 | 1299170765 | | Player D | 3 | 0 | 7s3h | 7s3h | 0 |
| No Limit | 10 | 25 | 1299170765 | | Player E | 4 | 0 | 5dTd | Td5d | 0 |
| No Limit | 10 | 25 | 1299170765 | | Player F | 5 | 0 | 8c6s | 8c6s | 0 |
| No Limit | 10 | 25 | 1299170765 | | Player G | 6 | 0 | 3sAc | Ac3s | 0 |
| No Limit | 10 | 25 | 1299170765 | | Player H | 7 | 0 | Kh7c | Kh7c | 0 |
| No Limit | 10 | 25 | 1299170765 | | Player I | 8 | 0 | JsQh | JsJhAdQh9s | 0 |

Table 1: Example Log Data

In the first game, 1399167686, both Player A and Player C went to a showdown. This is indicated both by the fact that the "board" column contains the board on both players' rows and by the fact that the showdown column is "1." Player C wins with a flush: Q♦T♦8♦5♦4♦ against Player A's two pair.

In the second game, 1299170765, the board is listed next to the singular winner, Player B. In this case, there was no showdown, even though the entire board (all five cards) were dealt. This indicates that all players still in the game when the river was dealt eventually folded to Player B. It is worth noticing that Player B had a pair of 2's as his best hand. Several players (A, G, and I) would have beaten that hand, had they stayed in.

Cigital analyzed 103,273,484 such hands that had the following characteristics:

**Cash Ring**     No play money games were considered. No

Exhibit 7 Page 25

Copyright © 2009 Cigital, Inc. and REEL. All Rights Reserved

| **Games** | "heads-up" tables were included. That is, there are some two-player games in the sample set, but they are situations where two players sat and played against each other at a table that would allow more than two players. |
| **Blinds 10¢ or higher** | So-called "microlimit" games (games with blinds less than $1) are considered too much like play money games, so only a few such games (10¢, 25¢, and 50¢) were included. The 2¢ and 5¢ games were excluded. |
| **December 1, 2008 to January 2, 2009** | Cigital selected this timeframe because it needed to independently corroborate a subset of the hands played with the actual players themselves. See Section 2.4. |

## 2.2   Data Analysis

For each hand analyzed, two facts were determined:

1. *Did the hand end in a showdown?* A "showdown" is a situation where all four rounds of betting have been completed and more than one player remains in the game. At least one player must show his cards so the winner can be determined.

2. If there was a showdown, *did the player with the best two cards win the hand?* It is relatively common for the best two cards (i.e., the player who would have made the best 5-card hand at showdown) to fold prior to the showdown.

### 2.2.1   Showdown Determination

Whether or not there is a showdown is a very simple fact to determine. There is no controversy or explanation necessary. Either there was more than one player in the game after all the betting was complete, or there was not.

### 2.2.2   Best Hand Win Determination

Determining whether the best hand won the showdown requires assumptions to be made. We are considering whether the player whose hole cards would combine with the board to make the best 5-card poker hand was actually the player who won at showdown.

Exhibit 7 Page 26

Copyright © 2009 Cigital, Inc. and REEL. All Rights Reserved

At least two situations arise occasionally that could be considered a best-hand-win or not.

**Equivalent Hands:** Assume the board is K♦4♣Q♦2♠J♥, and Player A has A♦T♣ and Player B has A♣T♠. Both have an Ace-high straight. Assuming no other players have better hole cards, both Players A and B would win at the showdown and would split the pot. If Player A folds early, but Player B goes on to the showdown, Player B will win the entire pot. It is arguable that since one of the two equivalent hands did go on and win, that the best hand did win this game.

**Board Best Hand:** In some cases the board is the best hand. For example, if the board is 8♦8♣8♥2♠2♥, it is quite likely (though not certain) that no player has a better hand than a full house 8s full of 2s. In such a situation, where no player's hole cards improve the board, all players who stay to the showdown will split the pot. If one or more players fold before the showdown, they will not share in the pot. This situation is a special case of the "Equivalent Hands" case, because in this situation all players are equivalent. Again, it is arguable that since some hands win at the end, the best hand did win the game.

Cigital has chosen to count both of these situations as hands where the best two cards **did not** win. Since there were players who folded early, but would have been paid had they stayed in, there were "best hands" that did not win. Using the alternative method and counting such hands would have only a small impact on the final result as such hands are relatively rare.

## 2.3   Statistical Method

Games in the log data were organized by "game type." Game type is a combination of the game rules (i.e., Limit, No Limit, or Pot Limit), any restrictions on the table size (e.g., 10 players or 6 players) and the blind/bet sizes. For each game type we then performed a statistical analysis of the percentages of showdowns and percentages of showdowns won by the best hand to see how representative they are of Texas Hold 'Em poker hands in general.

### 2.3.1   Description of the analysis

We are assuming that the distribution of the number of hands that go to showdown and where the best hand won follow the binomial distribution. Specifically, we are treating each hand as a separate

Exhibit 7 Page 27

Copyright © 2009 Cigital, Inc. and REEL. All Rights Reserved

independent test, where the results of one hand have no bearing on the results of any other.

When the amount of data is large (as it is in our survey) the distribution of proportions of binomial data fits closely to a normal distribution. This process has several steps:

1) We define X (the number of successes) and N (the sample size). For our purposes, X is the number of hands that went to showdown in the limit we are examining (or, the number of hands where the best hand won). N is the total number of hands surveyed at the limit we're examining.

2) We construct the Wilson Estimate of the proportion:

$$\tilde{p} = \frac{X + 2}{N + 4}$$

The Wilson estimate is a popular way of adjusting a proportion by acting as if we had two more successes and two more failures. Notice that when the sample size is large (as it is in the majority of our surveys) this adjustment will have almost no effect.

3) We determine the standard error of the proportion (again, assuming that the proportion can be approximated by the normal distribution):

$$SE_{\tilde{p}} = \sqrt{\frac{\tilde{p}(1 - \tilde{p})}{n + 4}}$$

which is just the standard deviation under the normal distribution under our Wilson estimate.

4) We then determine a desired confidence level C and determine a confidence interval:

$$\tilde{p} \pm z^* SE_{\tilde{p}}$$

where $z^*$ is the value for the standard normal density curve with area C between $-z^*$ and $z^*$. We computed this value for $z^*$ in Microsoft Excel as follows:

(a) Given the confidence percentage C, we compute the probability of anything being outside of the confidence interval

**Exhibit 7  Page 28**

Copyright © 2009 Cigital, Inc. and REEL. All Rights Reserved

on the right side of the normal distribution by:

$$p = \frac{1-C}{2}$$

(b) We then use the Microsoft Excel "NORMSINV" function to find the inverse of the standard normal distribution at probability p. This gives us our $z^*$ value. It should be noted that Excel uses an iterative search technique to generate the result, and so the results may not be exactly accurate. However, several checks were made against standard tables and the results of NORMSINV were found accurate to at least three decimal places.

5) Once we have our confidence interval, we can define the margin of error as:

$$m = z^* SE_{\hat{p}}$$

6) If desired, we can also fix a desired margin of error, and compute the required $z^*$ (and thus the required confidence level) needed to reach this margin of error by inverting this process.

For the case of determining the number showdowns won by the best hand, we perform the same analysis. We let X represent the number of hands won by the best hand in the limit we are examining. We let N be the total number of showdowns surveyed at that limit.

### 2.3.2   Assumptions and possible sources of error

As was alluded to above, we made several assumptions during this process. If these assumptions are not valid, that may impact the accuracy of our results.

1) We assume that the data surveyed follows the binomial distribution. Specifically, we assume that each hand is an independent event with fixed probability of a showdown, and that the result of whether one hand went to a showdown has no bearing on whether a subsequent hand goes to showdown.

2) We use the normal distribution to approximate the distribution of the proportions. This is just an approximation, and introduces a potential source of error. However, this is an accepted approximation when $n^*p \geq 10$, and $n(1-p) \geq 10$ (where n = the sample size, and p = the proportion of hands that go to showdown).

Exhibit 7  Page 29

Copyright © 2009 Cigital, Inc. and REEL. All Rights Reserved

and all of the limits examined are well beyond this lower bound.

3) We assume that December 2008 is a representative month of normal play at PokerStars, and that there is nothing special about it that would cause our extrapolations about how it represents other months in general to be wrong.

4) We assume that the calculations made, both the ones provided by Microsoft Excel functions, and the ones that were made to implement the formulas, are correct. Several entries were checked by hand and found to be correct.

5) We assume that the data collection was accurate, and that PokerStars gave us a complete and accurate representation of all hands played in the requested month, and that the collection of the "number of showdowns" and "total number of hands played" data is correct. Rather than take PokerStars' log files at face value, we performed independent corroboration directly with some players, as described in Section 2.4.

## 2.4   Verifying Log Data

PokerStars players were asked to independently submit their hand histories to Cigital, along with an attestation that the hand history was accurate.

### 2.4.1   Rationale

Part of the reason that we chose December 2008 as a sample month was so that the players would have their histories fresh. It gave them the best opportunity to honestly recollect their hands.

### 2.4.2   Mechanics

Each player sent their history by email. It included the following affirmation statement: *I, NAME, affirm that, to the best of my recollection, the attached data is an accurate representation of my activity on PokerStars.com.*

One might dispute the idea that a player can remember 60,000 hands accurately. The players who submitted histories are the kinds of players who use databases while they play. As each hand finishes, it is stored in their personal database. Certainly the player would notice a loss being recorded as a win and such obvious mistakes. The kinds of players who submitted hand histories are diligent and scrupulous about recording and analyzing their play. So,

Exhibit 7 Page 30

Copyright © 2009 Cigital, Inc. and REEL. All Rights Reserved

while it is unlikely that they remember all 60,000 hands in mid-January, it is highly likely that they vetted those hands as the hands were added to their database. Furthermore, the data the players provided was directly from their private databases, not from PokerStars itself. That is, it was data that they collected prior to our announcement of this study or any request for assistance. Thus, an extraction from their personal databases can be considered independent of PokerStars' influence.

### 2.4.3 Results

Cigital received 14 player histories covering 760,836 games. Out of that set of histories, 714,439 games applied to our sample set. The other 46,397 hands were either from the wrong date (e.g., November 30) or were from tables we are not analyzing (tournaments, heads-up, low-limit, etc.). This yields 0.69% of hands in the sample data directly confirmed by players. We treat these as samples of log data where a "successful test" is when the player's personal data match PokerStars' log file, and an "unsuccessful test" is when they don't.

All the players' histories agreed with PokerStars' log files exactly. We conclude that there is a 99.99% chance that the accuracy of ALL hands is 99.99% ± 0.001%. It is highly improbable that PokerStars modified the data in the log files.

# 3 Findings

The short summary of our findings is that 24.3% of hands result in a showdown. Of that 24.3% of hands that result in showdown, 50.3% of them are won by all players that were dealt two cards that combined with the board to make the best 5-card hand.

## 3.1 Margin of Error

To calculate the margin of error, we assumed a confidence level of 99.99%. The margin of error for the calculation of showdowns is estimated at ± 0.02%. The margin of error for the calculation of best hands winning is estimated at ± 0.01%. Individually, all but eight of the 55 game types had margins of error < ± 1%. Those eight game types did not experience significant play volume in the sample.

To explain the effect of margin of error, consider a specific game-type: No Limit 10¢/25¢ in December 2008. 26.1% of those hands went to showdown that month at that limit. If we were to sample

Exhibit 7 Page 31

Copyright © 2009 Cigital, Inc. and REEL. All Rights Reserved

lots and lots of months, we would expect some months to have a higher percentage, some months to have a lower percentage, and so on. These different percentages would stack up in a normal distribution (the bell curve, see Figure 1) **assuming that there is no reason for there to be differences in the data, other than random chance.**

That final assumption is critical. We can only extrapolate these values to be representative of reality if we assume that December 2008 is representative of reality.

Since the samples of all of the months fall into a normal distribution, we need to determine what the odds are that example month falls into the "fat" part of the bell curve. That's where confidence intervals and margins of error come into play.



Figure 1: Standard Bell Curve

Figure 1 is a "standard" distribution, which means that it has been rescaled to be centered around 0.

Given that 26.1% of the hands went to showdown. We want to know how likely it is that the "real" bell curve for this situation has its center at, or close to, 26.1 (in other words, how likely is it that the "0" position in the picture is really at 26.1?). Obviously, it is unlikely that it will be exactly 26.1%, but the margin of error gives us a range. If we set the margin of error to 0.1% in the calculations we are asking *How likely is it that the center is 26.1%, ± 0.1%?* It's never a sure thing—it's always theoretically possible that we had a freakishly weird month, but the more hands we sample, the less likely that's true. This is just like it's not too hard to have 9 out of 10 coin flips come up heads, but it's really unlikely—though theoretically

Exhibit 7  Page 32

Copyright © 2009 Cigital, Inc. and REEL. All Rights Reserved

possible—to have a 90% heads rate after a million coin flips. The confidence interval comes out to about 99%, and it's based on the margin of error we set. So, what that means is that it is 99% likely that the "0" position of the bell curve in our situation is between 26.0% and 26.2%.

If we increase the margin of error, our confidence goes up (because we have a wider range to cover, so it's more likely that the real center is in that range). If we decrease the margin of error, our confidence goes down (for the same reason).

We can also perform this calculation in the reverse direction. Suppose we want to have a certain confidence that the results are not a fluke. How wide a margin of error do we need for it to be that likely? If we work in this direction and look for a confidence level of 99.99%, we figure out how wide a band of possibility is needed to be 99.99% likely that the "0" position of the real distribution is within that band, based on our estimate. It turns out to be 0.05%. In other words, we believe it is 99.99% likely that 26.1% ± 0.05% of hands at the 10¢/20¢ limit will end up in a showdown.

# 4    Conclusion

It is clear from these numbers that, at least in the sampled data, the majority of games are determined by something other than the value of the cards, since no player reveals any cards to determine the winner. Only rarely (about 12% of all hands) does the player who can make the best 5-card hand go all the way to showdown and win. The statistical analysis of the logs gives us confidence that the logs accurately describe what was played. The analysis of the hands gives us confidence that this sample represents online Texas Hold'Em at PokerStars as a whole.

Exhibit 7  Page 33

Copyright © 2009 Cigital, Inc. and REEL. All Rights Reserved

# 5    Recorded Artifacts

The following log files and hand histories were received, stored, and used for this analysis.

## 5.1    PokerStars Log Files

| File | SHA-1 signature | File | SHA-1 signature |
|---|---|---|---|
| HandsDec01.txt.gz | c5501596528dc717338b2a53c0d224c125d79729 | HandsDec17.txt.gz | e0f82db68d4411724ea45b5c383ff8e0ebf790a58 |
| HandsDec02.txt.gz | 90caeb2cbda43c7720d628bb3f92d731b7128ad9 | HandsDec18.txt.gz | 6f4d4209b78bdcf0a7466fea5e92b7d4678a3123 |
| HandsDec03.txt.gz | cf3aac342ded4951d550090d4dcf05bc77ca833a | HandsDec19.txt.gz | 4bd8bdf4e28b01d10a94e87d93d631f7f36b8c15 |
| HandsDec04.txt.gz | b8d4c3dc5301384fd7e9da8210c0f04ed248aa98 | HandsDec20.txt.gz | a318b050d9f4c019531fe1295c334bb1aa8cc68b |
| HandsDec05.txt.gz | 717d0d87cd7d290533f3b70a9e9cb8b5f0bf7f6e | HandsDec21.txt.gz | b3920863256aa224831eebeaf93cf1145f6435ca |
| HandsDec06.txt.gz | 8150330d3b7eb38af78c83ed6c0a3a45c197e216 | HandsDec22.txt.gz | eea2fdec8512a2cef09c89188600640a68cfca24 |
| HandsDec07.txt.gz | 2289a717c1896468d069b6331e96a4197317d446 | HandsDec23.txt.gz | 623c5a6e5021e1560cbfcbe506c8cf7fe40af8c6 |
| HandsDec08.txt.gz | 641ffb8ed18a27d17fd7ba7d25646257cf7343ac | HandsDec24.txt.gz | 524c35fb57532186bf684f6ac0f64bd0e1c76093 |
| HandsDec09.txt.gz | bf6b86ba566571a2b5fb5b2d3cd8bc97770c2bfc5 | HandsDec25.txt.gz | 1996e0479bb2e8bc5557578c13d3ea4b591639f5 |
| HandsDec10.txt.gz | 20f27406f47b080cb0cd09112dde2f52deb96453 | HandsDec26.txt.gz | 14e1c82537b2a1c88bae32e4fbc537f38cbe4ef5 |
| HandsDec11.txt.gz | 1fb1d1ade45fd2b649e055956494ca207e078bf8 | HandsDec27.txt.gz | d0d13614584ab7e6b335df8f402e6d8c94b309a5 |
| HandsDec12.txt.gz | 3aee3fd7a538096104ffbf22a9f44b010beb13b7 | HandsDec28.txt.gz | 7373859b2120dc6681b9d382abd0c7dedde9bb3b |
| HandsDec13.txt.gz | 2dc2b691fc6559ea5f0d3553616ebcad1a96529e | HandsDec29.txt.gz | d901cdc805c2fed8561119139503b5e187f03a6 |
| HandsDec14.txt.gz | df5f318f3b0f97f49e65369a1d849109e2a572f4 | HandsDec30.txt.gz | 44214e493fdaf335aa01907b7066c2254650597 |
| HandsDec15.txt.gz | 5ec47e468f03c51ac6637c2d567806ed370200f4 | HandsDec31.txt.gz | 19ec3cdfa2beddeb2bf39a81a5d62871e732877c |
| HandsDec16.txt.gz | d1384390abae8ec2c927892a364bd78b0ffc45c6 | HandsJan01.txt.gz | b5ee0ff2401ef9c03551159f45244a8ad2368bc1 |
| | | HandsJan02.txt.gz | 94e55df1892c64bfa7a4e7a804b6bd4ee5f891cc |

## 5.2    Player-submitted Hand Histories

| SHA-1 Signature | Archive File |
|---|---|
| f620fad11de3347002f76b680bc215469d4236c9 | furbean.zip |
| 5588409225a4a09482008301e21a72d37731df01 | LihanLi.zip |
| 621d2508b6836fcee55169acc5d344e9b3e1e47bb | basila.zip |
| 9b6ed3073b4bc4823f7fe274b255ee5c6b9728b8 | buntaine.zip |
| 0cee4d4e03cb472d08bbb9674fb8c4504e10324b | stein.zip |
| ddfdeac5a8f17c7715e886b2077e9764902be06f | Zeidler.rar |
| 6e424fc2ed793429a60fba34e5362f195a0345f9 | aguirre.zip |
| 4edbcac2eb92883077cc6fbd84f48c3ad89f4cfc | ajtal.zip |
| 57c5cf23a558dd271c936b92377d76b310c94ad2 | boyett.rar |
| 8fb769442b41475d270a4f81a61a26e0cc6ba495 | linnane.zip |
| 2cdd02064d95853181db54038e79ac3f10962366 | smith.zip |
| 3aafbafec8e51ee3c890609ec324d8989f58bf77 | zorec.zip |
| 1486eaa0b119b6aad360a8b8552d05c2e22b65bd | stabile.zip |
| 8849e37642aa24f016987c1c8e0c9ce8c84b178d | pfaff.zip |

Exhibit 7 Page 34

Copyright © 2009 Cigital, Inc. and REEL. All Rights Reserved

Statistical Analysis of Texas Hold'Em                           Recorded Artifacts

# For More Information

For more information about this document, contact:

| Contact | Title | Organization | Phone # | Email Address |
|---------|-------|--------------|---------|---------------|
| Mr. Brian Mizelle | Managing Principal | Cigital, Inc. | +1 703 404-5820 direct | bmizelle@cigital.com |
| Mr. Stuart Dross | VP, Sales | Cigital, Inc. | +1 703 404-5876 direct | sdross@cigital.com |
| Mr. Paco Hope | Technical Manager | Cigital, Inc. | +1 703 404-5769 direct | paco@cigital.com |

Table 2: Contact Information

# About Cigital, Inc.

Cigital helps commercial and government clients assure software quality and improve software development processes. Our Software Quality Management (SQM) solutions drive down the cost of deploying quality software and ensuring software reliability, security and performance. Cigital's expert Consultants measure software quality by combining proprietary methodologies, tools and knowledge to perform full-lifecycle testing via a risk management framework. The resulting metrics are used to drive application readiness decisions and identify the most cost-effective areas for software process improvement. Founded in 1992, Cigital (www.cigital.com) is headquartered in Northern Virginia with additional offices in Boston.



Digitally signed
by Paco Hope
Date: 2009.03.05
09:49:51 -05'00'

Exhibit 7 Page 35

Copyright © 2009 Cigital, Inc. and REEL. All Rights Reserved



3611 N. Ridge Rd
Wichita, KS. 67205

June 12, 2009

Account Services
PO Box 367
Escondido, CA 92033

Dear Account Services,

**Checks # 923527 & 919729** in the amounts of **$105.00 & $100.00** that you issued were cashed at one of our locations. These checks have been returned, dishonored by the bank upon which they were drawn. At this time, you have made no acceptable arrangements or contact with us, so "Demand for Payment in Full" is hereby made, along with a **$25.00 service charge per each item.**

Please be advised that the issuance of encashment of a bad check can result in punitive damages against you for the face value of the check plus three times the amount of the check not to exceed $1,500.00, as provided for by California Civil Code 1719.

If payment is not made within ten days, rest assured that Speedy/Rapid Cash will immediately take every effort to collect the amount due plus all court costs and statutory punitive damages.

We can be reached at 1-800-856-5013 if you should wish to resolve this matter voluntarily.

Sincerely,

Legal Department
Speedy/Rapid Cash

**Exhibit 8  Page 36**

6/18/2009

*[handwritten: Trex Fill Ref no 225.419.422]*

ACCOUNT SERVICES CORP
To Whom It May Concern  - **FINAL NOTICE** -
Po Box 367 Escondido
California 92033

To Whom It May Concern,  */Oa Legal Dept:*

This notice constitutes our final attempt to collect on the debt below.  Numerous attempts at collection have been unsuccessful.  Therefore, within five (5) business days of the date above, this file will be turned over to our attorneys for legal action.

| Date | Returned | Check # | Payee | Reason | Amount | Charges | Due |
|------|----------|---------|-------|--------|--------|---------|-----|
| 06/01/09 | 06/10/09 | 928416 | ██████ | Refer To Maker | 150.00 | 20.00 | 170.00 |
| 05/28/09 | 06/15/09 | 923680 | ██████ | Refer To Maker | 35.00 | 20.00 | 55.00 |
| 05/18/09 | 06/15/09 | 908783 | ██████ | Refer To Maker | 1,000.00 | 20.00 | 1,020.00 |

| | Total Amt Returned | Redeposits & Payments | Returned Amt Due | Charges Due | Total Due |
|---|---|---|---|---|---|
| **ACCOUNT SERVICES CORP TOTALS:** | 1,185.00 | 0.00 | 1,185.00 | 60.00 | 1,245.00 |

| | | | | **TOTAL AMOUNT DUE:** | **1,245.00** |
|---|---|---|---|---|---|

Should you wish to avoid the cost, inconvenience, and damage to your credit rating as a result of legal action against you, contact this office to arrange payment within five (5) business days of the above date.  If you have any questions or inquiries in this matter, please feel free to contact me at the number listed below upon receipt of this notice.

The Pay-O-Matic Corp
Attn: Loss Prevention Department
222-06 So. Conduit Ave
Springfield Gardens  NY  11413

We Need A Satisfactory Disposition On This Matter Asap All Payees Will Be Held @100% Of Principal Amount.

Sincerely,

Carl Molina
Collections Manager
Phone: 718-712-9284 x101  Fax: 718-712-9419

CC: *Non Non & Associates · ESQ.*
CC: *All Payers (Concerned)*

Exhibit 8  Page 37

1

# THE CHECK CASHING STORE

06/20/2009

ACCOUNT SERVICES CORP                1
P O BOX 367
ESCONDIDO, CA. 92033

Return Check No.:928949          Amount of Check:   $200.00
Drawn On:WELLS FARGO AND COMPANY Fees Due:          $30.00
Payee:▓▓▓▓▓▓▓▓▓▓                 Collection Costs:  $.00
                                 Payments Applied:  $.00
                                 Current Amount Due:$230.00

This letter is from CheckMart of Florida, Inc., d/b/a The Check
Cashing Store. As maker of the above referenced check, you have
ignored all efforts to resolve this matter by making payment of the
above balance.

If payment is not received within ten (10) days of the date of this letter,
The Check Cashing Store may seek a civil judgement against you,
which, if applicable,would include all service charges, fees, court
costs, reasonable attorney fees, and treble damages.
You may make payment at any of our convenient store locations, or
by mailing a cashier's check or money order to the address below.

To avoid further action, you must make payment in full immediately.

TO REQUEST ADDITIONAL INFORMATION, OR TO ADVISE THAT PAYMENT HAS BEEN
MADE, PLEASE CONTACT LORENZO ROBINSON AT (954)938-3550, EXT. 258.

THE CHECK CASHING STORE
EXECUTIVE OFFICES
LOSS MANAGEMENT DIVISION

Exhibit 8 Page 38

6340 N.W. 5th Way, Ft. Lauderdale, FL 33309 (954) 938-3550  Fax: (954) 938-3569



ACE Cash Express, Inc
1231 Greenway Drive
Suite 700
Irving, Texas 75038

ACE CASH EXPRESS

June 23, 2009

1497 1 MB 0.382/1-3/R1603/T4*****AUTO**MIXED AADC 750
Account Service Corp.
PO Box 367
Escondido, CA 92033-0367

|||||||||||||||||||||||||||||||||||||||||||||||||||

RE: Case # 5941609

To whom it may concern:

The item, Check # 918093 (the "Check") drawn on Account Service Corp., has been returned from your bank dishonored. On behalf of ACE Cash Express, Inc., we are hereby making a request for payment of the total amount due, $275.00 (which includes return check fees), immediately!

A check in the amount of $1000.00 was presented to your financial institution, but was returned to us due to "Stop Payment". Accordingly, you must also pay a returned check charge in the amount of $25.00, as provided in the Agreement and in accordance with applicable State Laws.

This is our second written request. Please pay ACE Cash Express, Inc. immediately by delivering cash, in the amount of $275.00 (which includes the returned check charge), to the branch at the address listed below or any other ACE location. It is urgent that you call the number listed below immediately to resolve this matter.

  THANK YOU FOR YOUR PROMPT AND IMMEDIATE ATTENTION TO THIS MATTER

Sincerely,

*Darrick White*

Darrick White                     Branch location:
Case Manager                      6686 El Cajon Blvd.
888-753-3200                      San Diego, CA 92115

This communication is from a debt collector for the purpose of collecting a debt and any information will be used for that purpose. Any telephone call may be recorded for quality assurance purposes.

M2/M2

Exhibit 8 Page 39

UnBank Company
10550 Wayzata Blvd
Wayzata, MN 55305

06/12/2009

Account Services Corp
Po Box 367
Escondido, CA 92033

## NOTICE OF DISHONOR AND DEMAND FOR PAYMENT

| | | | |
|---|---|---|---|
| **Check:** | 0000930199 | **Date:** | 6/2/2009 |
| **Maker:** | Account Services Corp | | |
| **Payee:** | ▮▮▮▮▮ | | |
| **Bank:** | Wells Fargo Bank Na | **Amount:** | $911.00 |
| **Reason:** | Refer To Maker | **Service Charge:** | $30.00 |
| **Store:** | Unbank #4 | **Total Due:** | $941.00 |

On or about 6/10/2009 1:26:36 PM, we cashed the item listed above for the named payee, which has been returned to us dishonored by the listed drawee bank. We hereby demand payment for the full amount of the item to be made within five (5) days.

The Uniform Commercial Code (Chapter 3) provides that if the payee cashes an instrument with an innocent third party who has no knowledge of any dispute or irregularity with the check, the third party becomes a "Holder in Due Course", and may collect payment directly from the Maker without regard to the underlying reason for the stop-payment action.

Having cashed the items in good faith, without the knowledge of any dispute or irregularity, we qualify as a Holder in due Course, and we hereby demand full payment for the items within five (5) days of your receiving this notification. Notification and Demand has also been served by mail upon the referenced payee in this matter.

Please help us to avoid instigating legal action by either paying for the items yourself or getting the payee to do so. If we file a claim, any filing fees and service costs incurred will be added to the minimum amount required to settle this matter. In addition, we will ask for civil penalties if this matter is taken to court.

Sincerely,

Bob Bloomberg,
Loss Prevention Manager
952-697-5249

**Exhibit 8 Page 40**

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Account Services Corporation: all funds on deposit at Union Bank, N.A. and Wells Fargo Bank in the name of Account Services Corp

**(b)** County of Residence of First Listed Plaintiff   San Diego
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Law offices of Michael Pancer, 105, W. F St, 4th Floor, San Diego, California, Tel: (619) 236-1826

## DEFENDANTS

United States of America

FILED

2009 JUL 10 PM 1:18

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

'09 CV 1495 JM RBB    DEPUTY

Attorneys (If Known)
US Attorneys for the S.D. of CA and the S.D. of NY
AUSA Arlo Devlin-Brown and AUSA Jeffrey Alberts

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☒ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                       and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 862 Black Lung (923) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 864 SSID Title XVI | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☐ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Federal Rule of Criminal Procedure 41(g)    29.USC 31
Brief description of cause:
Return of Seized Property

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:**  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):    JUDGE _____    DOCKET NUMBER _____

DATE  7/10/09

SIGNATURE OF ATTORNEY OF RECORD   Michael Pancer

**FOR OFFICE USE ONLY**

RECEIPT #  002885    AMOUNT $ 350    7/10/09 BH    APPLYING IFP ____    JUDGE ____    MAG. JUDGE ____

Court Name: USDC California Southern
Division: 3
Receipt Number: CAS002885
Cashier ID: bhartman
Transaction Date: 07/10/2009
Payer Name: MICHAEL PANCER, ESQ
-----------------------------------
CIVIL FILING FEE
 For: ACCOUNT SVCS CORP V USA
 Case/Party: D-CAS-3-09-CV-001495-001
 Amount:        $350.00
-----------------------------------
CHECK
 Check/Money Order Num: 2564
 Amt Tendered:  $350.00
-----------------------------------
Total Due:     $350.00
Total Tendered: $350.00
Change Amt:    $0.00


There will be a fee of $45.00
charged for any returned check.