1  Felix T. Woo (State Bar No. 208107)
   Sekret T. Sneed (State Bar No. 217193)
2  SONNENSCHEIN NATH & ROSENTHAL LLP
   601 South Figueroa Street, Suite 2500
3  Los Angeles, California 90017-5704
   Telephone: (213) 623-9300
4  Facsimile: (213) 623-9924

5  Marc J. Zwillinger (*pro hac vice application pending*)
   Joshua G. Berman (*pro hac vice application pending*)
6  SONNENSCHEIN NATH & ROSENTHAL LLP
   1301 K St. NW, East Tower, Suite 600
7  Washington, DC 20005-3364
   Telephone: (202) 408-6400
8  Facsimile: (202) 408-6399

9  Attorneys for *Amicus Curiae*
   Poker Players Alliance
10

11

12                 UNITED STATES DISTRICT COURT

13               SOUTHERN DISTRICT OF CALIFORNIA

14

15  In the Matter of the Seizure of ALL          No. 09-CV-1495 JM RBB
    FUNDS ON DEPOSIT AT UNION BANK,
16  N.A., IN SAN DIEGO, CALIFORNIA, IN           BRIEF OF AMICUS CURIAE POKER
    ACCOUNTS 353000248 AND 353000256,            PLAYERS ALLIANCE IN SUPPORT OF
17  AND ALL FUNDS ON DEPOSIT AT                   MOVANT
    WELLS FARGO BANK, IN
18  ESCONDIDO, CALIFORNIA, IN
    ACCOUNT NUMBER 7986104185, HELD
19  IN THE NAME OF ACCOUNT
    SERVICES CORPORATION, AND ALL
20  PROPERTY TRACEABLE THERETO,

21  ACCOUNT SERVICES CORPORATION

22              Movant,

23       vs.

24  UNITED STATES OF AMERICA,

25              Respondent.

26

27

28

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1

1

2

**TABLE OF CONTENTS**

3  I.     INTRODUCTION ................................................................................................ 1

4  II.    SEIZING FUNDS TRANSFERRED TO PLAYERS IS IN DIRECT
       CONFLICT WITH THE UIGEA. ..................................................................... 3

5

6  III.   POKER IS NOT PROHIBITED ILLEGAL "GAMBLING" UNDER THE
       IGBA. ................................................................................................................ 4

7         A.    The IGBA Does Not Prohibit Games Of Skill. .................................... 5

8         B.    Banking Games Or Lotteries Are Fundamentally Different From
             Games Of Skill. .................................................................................... 7

9

10        C.    Poker Is A Game Of Skill. .................................................................... 9

11              1.    An Analysis Of The Rules Of Poker As Played Online Reveal
                   That Poker Is A Game of Skill. .............................................. 9

12              2.    Empirical Studies Have Uniformly Concluded That Poker Is A
                   Game of Skill ......................................................................... 15

13

14              3.    Real World Results Demonstrate That Poker Is A Game of Skill .......... 18

15              4.    Online Poker Is A Game Of Skill ........................................... 21

16  IV.   POKER IS A PERMITTED GAME OF SKILL UNDER STATE LAW AND
       SO IS NOT PROHIBITED BY THE IGBA. ................................................... 23

17  V.    CONCLUSION ................................................................................................ 25

18

19

20

21

22

23

24

25

26

27

28

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1

# TABLE OF AUTHORITIES

2

## FEDERAL CASES

3   *Brock v. Claridge Hotel & Casino*, 711 F. Supp. 779 (D.N.J. 1989) ...................................6

4   *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) ...............4

5   *De Almeida v. United States*, 459 F.3d 377 (2d Cir. 2006) .........................................2

6   *Floyd v. United States*, 860 F.2d 999 (10th Cir. 1988).............................................2

7   *Forte v. United States*, 83 F.2d 612 (D.C. Cir. 1936)...............................................7

8   *Gustafson v. Alloyd Co.*, 513 U.S. 561 (1995) ......................................................5

9   *Hibbs v. Winn*, 542 U.S. 88 (2004)..................................................................4

10  *In re Indian Gaming Related Cases*, 331 F.3d 1094 (9th Cir. 2003) ...........................6

11  *National Football League v. Governor of State of Del.*,

12      435 F. Supp. 1372 (D. Del. 1977)............................................................5

13  *Santos v. United States*, 461 F.3d 886 (7th Cir. 2006), *cert denied*, 550 U.S. 902 (2007), *aff'd*,

14      128 S. Ct. 2020 (2008)......................................................................7

15  *United States v. U.S. Currency $83,310.78*, 851 F.2d 1231 (9th Cir. 1988) .................2

16  *United States v. $734,578.82 in U.S. Currency*, 286 F.3d 641 (3d Cir. 2002) ...............4

17  *United States v. Amato*, 540 F.3d 153 (2d Cir. 2008), *cert. denied sub nom. Fasciana v.*

18      *United States*, 129 S. Ct. 1635 (2009) ....................................................5

19  *United States v. Baker*, 364 F.2d 107 (3d Cir. 1966)..............................................7

20  *United States v. Febus*, 218 F.3d 784 (7th Cir. 2000) ...........................................7

21  *United States. v. Graham*, 534 F.2d 1357 (9th Cir. 1976)........................................8

22  *United States v. Ryan*, 284 U.S. 167 (1931) ...................................................25

23  *United States v. Spino*, 345 F.2d 372 (7th Cir. 1965)............................................7

24  *United States v. Turkette*, 452 U.S. 576 (1981) ................................................5

25  *Womack v. Commissioner of IRS*, 510 F.3d 1295 (11th Cir. 2007)............................6

26

## STATE CASES

27  *In re Allen*, 377 P.2d 280 (Cal. 1962)...................................................*passim*

28  *Ex parte Alvarez*, 94 So. 155 (Fla. 1922) ...............................................7

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

*Bayer v. Johnson*, 349 N.W.2d 447 (S.D. 1984) ............................................................................6

*Commonwealth of Pa., Pa. Liquor Control Board v. Liberty Fire Co. of*

    *Schuylkill Haven*, 537 A.2d 974 (1988)..........................................................................24

*D'Orio v. Startup Candy Co.*, 266 P. 1037 (Utah 1928)..................................................................23

*Indoor Recreation Enterprises, Inc. v. Douglas*, 235 N.W.2d 398 (Neb. 1975) ...........................23

*Johnson v. Collins Entertainment Co.*, 508 S.E.2d 575 (S.C. 1998) ...............................................6

*Kansas City v. Caresio*, 447 S.W.2d 535 (Mo. 1969) ......................................................................6

*Las Vegas Hacienda, Inc. v. Gibson*, 359 P.2d 85 (Nev. 1961) ....................................................23

*New York v. Hua*, 2009 WL 1575188 (N.Y.C. Crim. Ct. Queens County June 5, 2009) .............24

*People v. Delacruz*, 872 N.Y.S.2d 876 ..........................................................................................22

*Pennsylvania v. Dent*, No. 2008-733 (Pa. Ct. Com. Pl. Jan. 14, 2009) .............................11, 23, 24

*State ex rel. Kellogg v. Kan. Mercantile Association*, 25 P. 984 (Kan. 1891) ................................6

*Tibbetts v. Van de Kamp*, 271 Cal. Rptr. 792 (Cal. Ct. App. 1990) ................................................8

## FEDERAL STATUTES AND RULES

18 U.S.C. § 371 ..................................................................................................................................1

18 U.S.C. § 981 ..................................................................................................................................1

18 U.S.C. § 982 ...............................................................................................................................1, 2

18 U.S.C. § 1344 ................................................................................................................................1

18 U.S.C. § 1955 .........................................................................................................................*passim*

18 U.S.C. § 1956 ................................................................................................................................1

21 U.S.C. 853(k) ...............................................................................................................................2

31 U.S.C. §§ 5361-5367 ...................................................................................................................3

31 U.S.C. § 5362 ...............................................................................................................................3

31 U.S.C. § 5363 ...............................................................................................................................3

Federal Rule of Criminal Procedure 41 ........................................................................................2, 3

## FEDERAL MATERIALS

H.R. Rep. No. 109-412 ......................................................................................................................3

Prohibition on Funding of Unlawful Internet Gambling, 73 Fed. Reg. 69382..................................3

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

4

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**STATE STATUTES**

Cal. Penal Code § 330 (West 2009) ...................................................................8

Ga. Code Ann. § 16-12-20 (2009) ...................................................................24

N.M. Stat. § 30-19-1 (West 2009) ...................................................................24

N.D. Cent. Code § 12.1-28-01 (2009) ..............................................................24

Kan. Stat. Ann. § 21-4302 (West 2009) ...........................................................24

N.Y. Penal Law § 225.00 (McKinney 2008) ....................................................24

Wyo. Stat. Ann. § 6-7-101 (2009) ...................................................................24

**MISCELLANEOUS**

David Apostolico, *Machiavellian Poker Strategy: How to Play Like a Prince and Rule the*

  *Poker Table* (2005) ...................................................................................12

Black's Law Dictionary (8th ed. 2004). ........................................................5, 6

Peter Borm & Ben van der Genugten, *On a Measure of Skill for Games with Chance*

  *Elements* (1996) ......................................................................................18

Doyle Brunson, *Doyle Brunson's Super System: A Course in Power Poker* (2002) ...................12

T.J. Cloutier & Tom McEvoy, *Championship*

  *No-Limit & Pot-Limit Hold Em* (Cardoza 2004) ...........................................12, 13

Rachel Croson, Peter Fishman, & Devin G. Pope, *Poker Superstars: Skill or Luck?,*

  21 Chance No. 4 at 25-28 ..........................................................................9, 21

Laure Elie & Romauld Elie, *Chance and Strategy in Poker* (Sept. 2007) .............................17, 18

*Establishing Consistent Enforcement Policies in the Context of Internet Wagers: Hearings*

  *Before the H. Comm. on the Judiciary* (Testimony of Annie Duke on behalf of the Poker

  Players Alliance), http://judiciary.house.gov/hearings/pdf/Duke071114.pdf .........................21

Gus Hansen, *Every Hand Revealed* (2008) .........................................................12

Dan Harrington, *Harrington on Hold 'Em:*

  *Expert Strategy for No Limit Tournaments* (2005)...........................................12

Phil Helmuth, *Play Poker Like the Pros* 342-43 (HarperCollins 2003) ...........................12, 13, 14

Paco Hope & Sean McCulloch, *Statistical Analysis of Texas Hold 'Em* 5 (Mar. 4, 2009) ..........18

K. Alexa Koening*, Gambling on Proposition 1A: The California Indian Self Reliance

 *Amendment,* 36 U.S.F. L. Rev. 1033 (2002)..............................................................6

Patrick Larkey *et al*., *Skill in Games*, 43 Management Science 596 (1997) ........................*passim*

Eric Lindgren, *World Poker Tour: Making the Final Table* (2005)...............................12

Daniel Negreanu, *Power Hold'em Strategy* (2008)....................................................12

Blair Rodman & Lee Nelson, *Kill Phil: The Fast Track to Success in No-Limit Hold 'Em*

 *Poker Tournaments* (2005) ......................................................................12

Jonathan Rowson, *Chess For Zebras: Thinking Differently About Black and White*

 (Gambit Publications 2005)..................................................................19

David Sklansky, *Tournament Poker for Advanced Players* (2002) ...............................12

David Sklansky, *The Theory of Poker* (1994) ....................................................12

Michael A. Tselnik, *Check, Raise, or Fold: Poker and the Unlawful Internet Gambling*

 *Enforcement Act,* 35 Hofstra L. Rev. 1617, 1663 (2007) ......................................23

Webster's New International Dictionary (3d ed. 1971).................................................5, 7

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

6

# I.    INTRODUCTION

The poker players' funds the government has attempted to seize through the freeze letters and seizure warrants at issue here were not connected with any activity that is illegal under federal law.[1]  Under Federal Rule of Criminal Procedure 41(c) and 18 U.S.C. § 982, a warrant for a seizure may be issued and property forfeited only if the property to be seized and forfeited is connected with a crime.  The funds seized here, however, were involved in a transaction expressly permitted by the most relevant federal law governing financial transactions related to online gaming.  Likewise, the only gambling-related statute the government cited as authority for the seizure, the Illegal Gambling Business Act of 1970, 18 U.S.C. § 1955 ("IGBA"), does not prohibit participants from playing games of skill such as poker, for cash prizes.  Poker is a game of skill that requires players to be mathematicians, keen observers of human behavior, and capable deceivers.  Although a simple analysis of the rules of poker alone makes clear that such skills are required, scientific studies provide demonstrable proof that skill, not chance, is *the* key factor in winning or losing at poker.  Similarly, physical world results confirm that skilled players who regularly apply these strategies perform better than players who do not.  Poker is a game of skill, and consequently *players do not violate federal law by playing online poker* and thus the government has no authority to seize those players' funds.

As set forth in Movant's brief, Federal Rule of Criminal Procedure 41(g) provides an expedient avenue for the return of property in cases such as this one where the government has unlawfully seized property.  Mot. for Return of Prop & Mem. Of Points and Auths. at 7-8 ("ASC Br.").  The rule, as developed by case law, lets innocent parties recover funds unlawfully seized without unnecessary delay.  Because federal law permits the transfers at issue, and the activities poker players have engaged in are not unlawful under the IGBA, this Court should order the immediate of the seized funds to Account Services.

---

[1] In fact, some members of the Poker Players Alliance ("PPA") may be aggrieved parties with a legal interest in the funds seized.  This Court granted PPA leave to file this brief as *amicus curiae* in its July 15, 2009 order.  By filing this brief as *amicus curiae*, the PPA in no way waives its rights to participate under doctrines of associational standing in any future action regarding these funds, including but not limited to a civil forfeiture action under 18 U.S.C. § 981.

Following the initial filing in this case, the United States Attorney for the Southern District of New York indicted Douglas Rennick on charges under 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 1955 and 18 U.S.C. § 371 (conspiracy to commit offense) and now seeks criminal forfeiture of the same funds at issue here under 18 U.S.C. § 982.[2]  This filing, however, does not rectify the issues raised in Account Services' motion.  Instead, Mr. Rennick's indictment renders the remedies provided by Rule 41(g) even more important and necessary.  Under 18 U.S.C. § 982(b)(1) and 21 U.S.C. § 853(k), third-parties may not intervene in a criminal forfeiture proceeding until *after* a court issues an order of forfeiture nor may they file a *subsequent* action seeking a declaration of its rights in the funds. Thus, this 41(g) action is the only mechanism for a timely return of ASC and the players' funds. As the Court of Appeals for the Second Circuit recognized in *De Almeida v. United States*, 459 F.3d 377, 382 (2d Cir. 2006), a district court may retain jurisdiction to entertain a 41(g) motion for return of seized property filed before indictment, like this one, even after the indictment comes down.[3]  In so holding, the court noted that, "[a] third party claimant contesting a criminal forfeiture may lack an adequate remedy at law if the claimant faces months or years of delay before the claimant may seek an ancillary proceeding in the criminal forfeiture action." *Id.*; *see also Floyd v. United States*, 860 F.2d 999, 1007 (10th Cir. 1988) (finding "that [the district] court did not abuse its discretion by retaining jurisdiction" over  previously filed 41(g) motion after government had instituted administrative forfeiture proceeding).  That is precisely the case here.  The funds sought do not belong to Mr. Rennick.  They are instead poker players' funds being lawfully and properly returned by Account Services, which has not itself been indicted.  If not afforded relief by this Court, Account Services and poker players across the United States may have no choice but to wait years for the resolution of Mr. Rennick's criminal case before

---

[2] The government's charges under 18 U.S.C. § 1344 and 18 U.S.C. § 371 were not used as the basis for the seizure warrants and the seizure of property at issue in this case.

[3] *See United States v. U.S. Currency $83,310.78*, 851 F.2d 1231, 1233 (9th Cir. 1988) (Distinguishing dismissal of 41(g) motions in civil and criminal cases, stating that "[Fed. R. Crim. P. 1(5)(b)] compels the dismissal of Rule 41[(g)] motion in a *civil* forfeiture proceeding where there are no criminal proceedings pending and the property was not seized for use in a criminal prosecution." (emphasis in original))

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

they may apply for relief.  As such, this Court should exercise its discretion  to resolve the issues in this proceeding, and at the conclusion of it, to return the funds seized to Movant Account Services Corporation ("ASC") pursuant to Federal Rule of Criminal Procedure 41(g).

## II.    SEIZING FUNDS TRANSFERRED TO PLAYERS IS IN DIRECT CONFLICT WITH THE UIGEA.

The Unlawful Internet Gambling Enforcement Act of 2006, codified at 31 U.S.C. §§ 5361–5367 ("UIGEA") was passed as Title VIII of the SAFE Port Act, Pub. L. 109-347, 120 Stat. 1952 (Oct. 13, 2006) in the fall of 2006, with the "primary purpose" of giving authorities "tools for combating offshore Internet gambling sites that illegally extend their services to U.S. residents via the Internet."  H.R. Rep. No. 109-412, pt. 1, at 8 (2006).  The UIGEA is the most recent, specific, and comprehensive statute to address gambling, and it is the only federal statute that directly addresses online gambling.  Online poker does not violate the UIGEA.

Criminal culpability under the UIGEA is limited to those persons who operate illegal gambling sites, rather than those who process payment transactions.  The UIGEA, however, prohibits financial institutions and third-party payment processors from processing "restricted transactions" involving transmission of funds or proceeds related to unlawful Internet gambling.  The UIGEA defines "restricted transactions" to "mean[] any transaction or transmittal involving any credit, funds, instrument, or proceeds described in any paragraph of section 5363 which the recipient is prohibited from accepting under section 5363."  31 U.S.C. § 5362(7).  Section 5363 prohibits persons "engaged in the business of betting or wagering" from accepting any transfer of funds "in connection with the participation of another person in unlawful Internet gambling."  31 U.S.C. § 5363.  In the Final Rules issued pursuant to the UIGEA, the Department of the Treasury ("the Treasury") made clear that § 5363's limitation of liability to "person[s] engaged in the business of betting or wagering" means that the term "'restricted transaction'" can never "include funds *going to a gambler*"—as a gambler is not "'engaged in the business of betting or wagering.'"  73 Fed. Reg. 69382, 69387 n.37 (Nov. 18, 2008) (quoting 31 U.S.C. § 5363) (emphasis added).  Under well-established precedent, courts should defer to the Treasury's interpretation of UIGEA to exclude transactions involving funds going to a gambler.  *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("[A] court may not substitute its own construction of a

statutory provision for a reasonable interpretation made by the administrator of an agency.")

The government's actions in this case constitute an end run around the UIGEA, and the Treasury's interpretation thereof, in an attempt to criminalize the lawful action of transferring funds to a player. As ASC has stated in its brief, the majority of funds seized in this case are funds going to players -- not to an online poker site. ASC Br. at 17. The government itself admits as much by stating in Mr. Rennick's indictment that he "and his co-conspirators receive funds from offshore internet gambling companies, cause those funds to be wired into United States bank accounts, and then cause the funds to be disbursed through checks payable to United States residents who are seeking to cash out their gambling winnings." Indictment, 09-CRIM-752 at 1 (S.D.N.Y. August 5, 2009). Indeed, ASC specifically identifies bounced checks that players have attempted to cash as one of the principal sources of its harm. ASC Br. at 17-18. If the government is able to seize funds directly related to transactions that the UIGEA expressly permits using the IGBA, an older statute that does not specifically address internet gambling, then UIGEA's express exceptions are rendered superfluous in direct contradiction to Congress's intent. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (quoting 2A N. Singer, Statutes & Statutory Construction § 46.06, pp.181–186 (rev. 6th ed. 2000) ("'A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'") As such, in order to uphold the express Congressional intent in enacting UIGEA and to accord proper deference to the Treasury's interpretation thereof, this Court should not permit the government to seize the player funds at issue using the IGBA.[4]

## III.    POKER IS NOT PROHIBITED ILLEGAL "GAMBLING" UNDER THE IGBA.

The IGBA criminalizes only a "gambling business" that "is a violation of the law of a State or political subdivision in which it is conducted." 18 U.S.C. § 1955(b)(1), (i). The IGBA categorizes "'gambling'" as "'includ[ing] but . . . not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein." *United States v. $734,578.82 in U.S. Currency*,

---

[4] In any event, as discussed in Section II, IGBA is inapplicable.

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

286 F.3d 641, 648 (3d Cir. 2002) (quoting 18 U.S.C. § 1955(2)).  In order to establish probable

cause supporting seizure of funds pursuant to a seizure warrant based on a violation of the

IGBA, the government must demonstrate that: (1) the party's whose property it has seized is in

the business of gambling as that term is defined by the statute, (2) that five or more people are

involved in the operation of the business, (3) that the business operated for more than 30 days or

had gross revenue of more than $2,000, and (4) the defendant operated the business in violation

of the law of the state in which it is operating.  18 U.S.C. § 1955(b)(1)(i)-(iii).  For online poker,

not all of these elements are met, and therefore online poker does not violate the IGBA.

### A.     The IGBA Does Not Prohibit Games Of Skill.

The IGBA enumerates certain activities that are examples of gambling.  Examining

"gambling" in relation to the words around it, *see, e.g., Gustafson* v. *Alloyd Co.*, 513 U.S. 561,

575 (1995) demonstrates that IGBA *excludes* skill-based games, such as chess, bridge or internet

poker.[5]  Specifically, skill-based games cannot be "gambling" under the IGBA's definition

because they are not similar to the activities enumerated by the statute.  Even a cursory

examination of the games listed makes that clear:

- *Pool-selling* -- Pool-selling is the selling or distribution of chances in a betting pool[6] – *i.e.*, "[a] gambling scheme in which numerous persons contribute stakes for betting on a particular event (such as a sporting event)."[7]  Courts view pool-selling as a game of chance.[8]

---

[5] Under the *ejusdem generis* canon of statutory construction, "general terms that follow specific ones are interpreted to embrace only objects of the same kind or class as the specific ones." *United States v. Amato*, 540 F.3d 153, 160 (2d Cir. 2008), *cert. denied sub nom. Fasciana v. United States*, 129 S. Ct. 1635 (2009); *see also United States v. Turkette*, 452 U.S. 576, 581 (1981) ("[W]here general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated.").  Since the statute specifies certain activities which comprise gambling, to determine whether a non-enumerated activity constitutes gambling courts must determine whether that activity is "of the same kind" as the enumerated activities.

[6] Webster's New International Dictionary 1764 (3d ed. 1971).

[7] Black's Law Dictionary 1198 (8th ed. 2004).

[8] *See, e.g., Nat'l Football League v. Governor of State of Del.*, 435 F. Supp. 1372, 1385–86 (D. Del. 1977) ("chance rather than skill is dominant factor" in betting pool).

Sonnenschein Nath & Rosenthal LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
(213) 623-9300

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

- *Bookmaking* -- Bookmaking is "[g]ambling that entails the taking and recording of bets on an event, such as a horse race."[9]  Like pool-selling, bookmaking is a game of chance, because as in pool-selling, the bettors have no way of affecting the outcome of events.[10]  In a bookmaking scheme, the bookmaker fixes the stakes,[11] so bookmaking is a banking game.

- *Slot machines* -- Slot machines are coin operated mechanical or electronic devices that pay off when random, individually selected symbols match one another on the machine's display.  Otherwise, the bet goes to the house.  Slots are thus games of chance and banking games.[12]

- *Roulette* -- Roulette is a game in which players bet whether a ball, spun along a revolving wheel, will land on a certain color (black or white) or a certain number (00 through 36).  Players make their wagers against the house -- hence roulette is a banking game -- and the outcome is determined purely by the chance that the ball lands on the wagered number or color.

- *Dice tables* -- Dice are cubes, with each face typically marked with between one and six spots.[13]  Dice tables are banking games[14] and games of chance wherein players throw dice, usually in pairs, and make wagers against the house on the chance outcome of the throw.

- *Lotteries* -- A lottery is "[a] method of raising revenues, esp. state-government revenues, by selling tickets and giving prizes (usu[ally] large cash prizes) to those who hold tickets with winning numbers that are drawn at random."[15]  Because lottery drawings are random, a lottery participant cannot affect the outcome, and lotteries are

---

[9] Black's Law Dictionary 194 (8th ed. 2004).

[10] *See Bayer v. Johnson*, 349 N.W.2d 447, 449 (S.D. 1984) ("The outcome of . . . events [in a bookmaking scheme] in no way depends upon the skill of the bettors.  The wagering is therefore a contest in which chance predominates over skill").

[11] *See id.*

[12] *See, e.g.*, *In re Indian Gaming Related Cases*, 331 F.3d 1094, 1104 & n. 12 (9th Cir. 2003) (quoting K. Alexa Koening, *Gambling on Proposition 1A: The California Indian Self Reliance Amendment*, 36 U.S.F. L. Rev. 1033, 1041 n.65 (2002) ("'Las Vegas-style slot machines offer "house-banked" games, which enable the house to collect players' losses.'"); *Brock v. Claridge Hotel & Casino*, 711 F. Supp. 779, 780 (D.N.J. 1989) (describing slot machines and blackjack as games of chance).

[13] *See* Random House Webster's Unabridged Dictionary 549 (2d ed. 1998).

[14] *See, e.g.*, *Kansas City v. Caresio*, 447 S.W.2d 535, 538 (Mo. 1969) (finding that dice game was "game of chance" under local ordinances).

[15] Black's Law Dictionary 966 (8th ed. 2004); see also *Johnson v. Collins Entm't Co.*, 508 S.E.2d 575, 579 (S.C. 1998) ("Video gaming devices do not come within the plain and ordinary meaning of 'lottery' because they do not involve a drawing and 'tickets' or other indicium of entitlement to a prize.").

games of chance.[16]  Moreover, because the house keeps any bet that does not pay out, a lottery is a banking game.

- *Numbers games* -- In a numbers game, players wager that on a certain day, a chosen series of numbers will occur in some event to which the numbers are pegged.  For instance, a player can bet on the payoff totals of a day's races, and learn of the fate of the wager by checking the paper the next day.  A banker (the house) guarantees the payoffs to any winners, and "[i]n such a game neither the number of winning players nor the total amount of the payoffs can be predicted in any one day,"[17] making the game one of chance, as well.

- *Bolita* -- Bolita is a form of lottery "in which one attempts to guess a variably determined 2-digit number,"[18] sometimes derived by drawing numbered balls from a hopper,[19] or somehow tied to the results of the state lottery.  Because the numbers are "variably determined," courts consider bolita a game of chance.[20]  Bolita is a banking game because it is a form of lottery.

- *Policy* -- Policy is similar to bolita or a numbers game, but differs in the method of determining the winning sequence or combination of digits.  "In policy, [the winning sequence] is ascertained by the drawing *at random* from a wheel in which tags, each bearing one of the possible combinations of numbers that can be played, have been placed."[21]  Like numbers and bolita, policy is a game of chance[22] and a banking game.

### B.    Banking Games Or Lotteries Are Fundamentally Different From Games Of Skill.

Poker has none of the relevant characteristics of the banking and lottery games specifically identified in the IGBA.  Banking games such as those enumerated in the IGBA share three principal characteristics they are:  (1) games of chance, (2) played against the house, and (3) the house's profits are dependent on the result of the game.  The lottery and pool-selling

---

[16] *See, e.g.*, *Womack v. Comm'r of IRS*, 510 F.3d 1295, 1306 (11th Cir. 2007) (describing lottery as "game of chance"); *State ex rel. Kellogg v. Kan. Mercantile Ass'n*, 25 P. 984, 985 (Kan. 1891) (holding that plan for allocation of prizes "by chance" is a lottery).

[17] *United States v. Baker*, 364 F.2d 107, 112 (3d Cir. 1966).

[18] Webster's New International Dictionary (3d ed. 1971).

[19] *See, e.g.*, *United States v. Spino*, 345 F.2d 372, 373 (7th Cir. 1965).

[20] *See, e.g.*, *Santos v. United States*, 461 F.3d 886, 888 (7th Cir. 2006) (describing "bolita" as lottery), *cert denied*, 550 U.S. 902 (2007), *aff'd*, 128 S. Ct. 2020 (2008); *United States v. Febus*, 218 F.3d 784, 788 (7th Cir. 2000) (same); *Ex parte Alvarez*, 94 So. 155, 155 (Fla. 1922) (describing bolita as "game of chance").

[21] *Baker*, 364 F.3d at 112 (emphasis added).

[22] *See, e.g.*, *Forte v. United States*, 83 F.2d 612, 615-16 (D.C. Cir. 1936) (noting that "policy game is undoubtedly a lottery," defined by D.C. Code as game of chance).

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1  games listed in IGBA are games of *pure* chance, wherein the house keeps any bets that are not

2  paid out, and the bettors are not participants in the underlying activity being bet on.[23]  Poker is

3  distinguishable from both categories of games.  First, while all of the enumerated games are

4  indisputably games of chance, none are games of skill.  Second, in every game listed above the

5  player plays against the house.  If a player places a winning bet, the *house* pays the bet; if a

6  player places a losing bet, the *house* retains the amount bet.  In poker, on the other hand, players

7  play against other players, not the house.  When a poker player wins a hand, other players -- not

8  the house -- pay the winner.  Third, because it does not collect losing bets in poker -- those are

9  paid to the winner of a hand -- the house's profit does not depend on the results of the poker

10  game.  *See e.g. United States. v. Graham*, 534 F.2d 1357, 1358 (9th Cir. 1976) (distinguishing

11  "many 'side' bets made at the crap table" from bets "against the 'house'").  Instead, the house

12  profits by charging a small fee, often called a "rake" for facilitating peer-to-peer poker between

13  players.  Finally, unlike bettors in lottery or pool-selling games, poker players are participants in

14  the game bet on and have control over the outcome -- they are not passive observers merely

15  hoping for a favorable result.  The "rake" is a generally fixed percentage of every pot, up to a

16  maximum amount, and is no way contingent on who wins each hand.[24]  Poker therefore shares

17  none of the three principal traits shared by the games listed in the IGBA, and thus is not properly

18  "gambling" under the statute.[25]

19

20  [23] In some lottery games where at least one participant must win money, the house may keep a
21  percentage of all bets--such as in a 50/50 drawing where a charity splits the amount raised by
    selling raffle tickets evenly with the winner.

22  [24] In fact, on two popular internet poker sites, the maximum rake is only $3 or $5 per hand.  *See*
23  http://www.fulltiltpoker.com/rake.php & http://www.pokerstars.com/poker/room/rake/.

24  [25] Poker is not gambling under California law.  California Penal Code § 330, provides that
25  gambling constitutes "Every person who deals, plays, or carries on, opens, or causes to be
    opened, or who conducts, either as owner or employee, whether for hire or not, any game of
26  faro, monte, roulette, lansquenet, rouge et noire, rondo, tan, fan-tan, seven-and-a-half, twenty-
    one, hokey-pokey, or any banking or percentage game played with cards, dice, or any device, for
27  money, checks, credit, or other representative of value, and every person who plays or bets at or
    against any of those prohibited games, is guilty of a misdemeanor…"  The California courts,
28  legislature, and Attorney General, have recognized that these games, which are similar to those
    listed in IGBA, are banking and percentage games of chance and thus poker is not prohibited.
    *See e.g.  Tibbetts v. Van de Kamp*, 271 Cal. Rptr. 792, 794 (Cal. Ct. App. 1990) ("Texas

8

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**C.    Poker Is A Game Of Skill.**

There are a number of different methods courts and commentators have employed to determine whether poker is a game of skill and thus not prohibited by the IGBA (or, as will be discussed below, state law):  (1) an analysis of the rules and structure of the game, *see, e.g.*, *In re Allen*, 377 P.2d 280, 281-82 (Cal. 1962) (holding the card game of bridge to be one predominantly of skill); (2) empirical studies, *see, e.g.*, Patrick Larkey *et al.*, *Skill in Games*, 43 Management Science 596 (1997) (attached as Ex. 1); and (3) examination of real world results. *See e.g.* Rachel Croson, Peter Fishman, & Devin G. Pope, *Poker Superstars: Skill or Luck?*, 21 Chance No. 4 at 25-28 (attached as Ex. 2).  All three of these modes of analysis lead to the same conclusion: poker is a game of skill.

**1.    An Analysis Of The Rules Of Poker As Played Online Reveal That Poker Is A Game of Skill.**

Several variants of poker may be played online, but they all share characteristics that unequivocally demonstrate they are games of skill.  Each variant requires poker players to make decisions regarding betting, raising, or folding at repeated points during each hand.  Each form of poker requires players to be able to "read" their opponents to predict what cards those players might be holding.  In each form of poker, during the course of a single session of playing poker a player will play scores of hands, each with numerous decisions points and will thus have to make hundreds of those decisions and evaluations of other players.  As will be discussed in more detail below, each of these decisions affects the outcome of the hand and the effect becomes more pronounced over numerous hands.

By far, the most popular variant of poker offered online generally and by the operators in this case is Texas Hold 'Em.  Texas Hold 'Em may be played with between two and ten players.  In Texas Hold 'Em, the dealer deals each player two cards face down.  These two cards are often referred to as "hole cards."  No other cards are dealt at this time.  The player to the left of the dealer then must place a bet called the "small blind." The player to the left of the "small blind"

Hold'em" is not proscribed by § 330) *see also* Cal. Stats. 1991, c. 71 (A.B. 97), § 1 (deleting reference to "stud-horse poker").

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1    then must place a "big blind" bet, which is generally double the small blind.  Each player seated

2    at the table then has an opportunity to bet.  In order to continue playing, each player must then

3    place a bet either equal to the big blind or larger.  If a player places a bet larger than the big

4    blind, then each other player has an opportunity to match that bet by "calling" or increase the bet

5    by raising.  If no player has raised, and the player that placed the big blind bet does not wish to

6    raise, he or she may "check."  Players may fold at any time.  Once all players have bet (or

7    elected not to bet), the dealer then deals three "community" cards face up, called the "flop" that

8    all players may combine with their hole cards to form the best hand.  Another round of betting

9    takes place, and then the dealer deals a fourth card, called "the turn."  Again, players have an

10   opportunity to bet.  Finally, the dealer deals a fifth card, known as "the river."  Again, there is

11   another round of betting if more than one player remains in the hand.

12        If more than one player is left after the final round of betting, then the hand proceeds to a

13   "showdown."  In the showdown, each player makes the best five-card hand out of the seven

14   cards available to him or her: two face down cards in his or her hand and the five face up

15   community cards.  The winning hand is then determined by its rank relative to the other

16   remaining players' hands.  A showdown is the only time that a player must reveal his hole cards

17   to other players.  Players, however, have the option of showing their hole cards at any time.

18   Consequently, it is only at the showdown where the winner is determined by the fall of the cards

19   rather than by which players have folded in response to the moves of other players.    If the

20   players have hands of equal rank, then they split the pot.[26]

21        Thus, in each hand of Texas Hold 'Em, a player has four principal decision-making

22   opportunities: (1) after he receives his hole cards, (2) after the "flop," (3) after "the turn," and (4)

23   after the "river."  Draw games similarly require three decisions -- a "bet" after the initial draw, a

24   decision about which and how many cards to exchange for new cards, and another "bet" after

25

26   [26] The second most popular game is Omaha, which proceeds almost exactly like Texas Hold
27   'Em.  In Omaha games, players receive four, rather than two, hole cards and players make the
     best or worst hand using two hole cards and three of the five community cards.  The best "high"
28   hand and the best "low hand," such as 5, 4, 3, 2, Ace, split the pot.  Together Texas Hold 'Em
     and Omaha constitute approximate 93% of online poker hands played.

the exchange.  Stud games, played with an initial deal of two cards and then additional cards dealt one at a time until each player has a total of either five (five-card stud) or seven (seven-card stud) cards, require either four or six moves, the first after the initial deal and the rest after each additional card.  These decisionmaking stages significantly reduce any element of chance in the game, since logical decision-making at each of these stages allows the player to control whether, and how much, he wins or loses.

To make the right decisions regarding whether to fold, call, check, or raise consistently, poker players must employ a range of skills.  To make optimal moves at each of these stages, players must be mathematicians, observers of human nature, and capable deceivers.  As one court recently held, "[s]uccessful players must possess intellectual and psychological skills. They must know the rules and the mathematical odds.  They must know how to read their opponents' 'tells' and styles.  They must know when to hold and fold and raise.  They must know how to manage their money." *Pennsylvania v. Dent*, No. 2008-733, slip op. at 13-14 (Pa. Ct. Com. Pl. Jan. 14, 2009) (attached as Ex. 3).  Indeed, courts have found that bridge is a game of skill based on similar skills stating that "bridge embraces a technique in which complexity approaches that of chess; and, in addition, a scope for deductive analysis, psychology, alertness and mental ascendancy over one's opponents.  Thus it is an art, which can hardly be taught or even described."  *In re Allen*, 377 P.2d at 282 (quoting 6 Encyclopedia Britannica 349 (1962)).

**Mathematicians.**  Skilled poker players must be able to understand and calculate the odds that they will be able to make a sufficiently high-ranked hand to win the pot out of the cards in their hands and the community cards available to them.  The skill required is far more than simply a sophisticated knowledge of odds, which is merely a prerequisite to competent poker play.  The player must be able to calculate the odds, for his own hand, of other players holding better or worse hands, and the odds relative to the amount of money in the pot.  The minimal amount of time given to make a bet also heightens the skill required to calculate the odds correctly.[27]

---

[27] This is especially true in online poker, where the software forces players to move within a certain amount of time.  *See, e.g.,* Full Tilt Poker, Site Rules, http://www.fulltiltpoker.com/

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

1     **Observers**.  Calculation of the odds is, however, only the most basic skill required for

2   competent poker play.[28]  Players must also be capable observers of the others' conduct.  Indeed,

3   as one poker expert has stated, "It has always been my belief that knowing your opponents in

4   pot-limit and no-limit hold'em—how they usually play, and how they play in specific

5   situations—is the most important thing in the game." T.J. Cloutier & Tom McEvoy,

6   *Championship No-Limit & Pot-Limit Hold 'Em* 21 (Cardoza 2004).  Numerous other experts

7   agree that observation skills are of paramount importance.[29]  While depictions of poker in

8   popular culture often focus on a player's ability to read facial tics and mannerisms, those are

9   only a small part of observing opponents.  The amount which a player bets, how long it takes the

10  player to decide to place the bet, at what stage in the hand the player places the bet, where

11  players are sitting relative to the dealer when they place the bet, and the size of the player's bet

12  relative to other players' bets are just some of the factors a skilled poker player must consider

13  before placing their own bet or folding. *See e.g.* Phil Helmuth, *Play Poker Like the Pros* 342-43

---

16  siteRules.php ¶ 11.

17  [28] Indeed, if calculation of the odds were the only skill required in poker, one would assume that
    computers -- exceedingly good calculators of odds -- would perform as well as the most skilled
18  poker players using fairly simple odds calculation software.  But as recent computer poker
    simulations and competitions attest, much more complicated strategies are necessary to succeed
19  at the highest levels.  *See* Michael Johanson, Martin Zinkevich, & Michael Bowling, Computing
    Robust Counter-Strategies, *available at* http://poker.cs.ualberta.ca/papers/Papers/NIPS07-
20  rnash.pdf) (Attached as Ex. 4) (providing descriptions of complex computations required for
    good computer poker programs and methods of adapting to the play of other players); Results
21  for the 2007 American Association for Artificial Intelligence ("AAAI") Computer Poker
    Competition *available at* http://www.cs.ualberta.ca/~pokert/2007/index.php (providing
22  information about the best poker playing computers.)

23  [29] As is the case with bridge, the presence of voluminous "literature designed to increase the
    player's skill" in playing poker "is a persuasive indication that [a game] is not predominately a
24  game of chance."  *In re Allen*, 377 P.2d at 282. For examples of literature designed to increase a
    player's poker acumen, *see, e.g.,* Gus Hansen, *Every Hand Revealed* (2008); Daniel Negreanu,
25  *Power Hold'em Strategy* (2008); David Apostolico, *Machiavellian Poker Strategy*: *How to Play
    Like a Prince and Rule the Poker Table* (2005); Dan Harrington, *Harrington on Hold 'Em:
26  Expert Strategy for No Limit Tournaments* (2005); Eric Lindgren, *World Poker Tour: Making
    the Final Table* (2005); Blair Rodman & Lee Nelson, *Kill Phil: The Fast Track to Success in
27  No-Limit Hold 'Em Poker Tournaments* (2005); Doyle Brunson, *Doyle Brunson's Super System:
    A Course in Power Poker* (2002); David Sklansky, *Tournament Poker for Advanced Players*
28  (2002); David Sklansky, *The Theory of Poker* (1994).

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

(HarperCollins 2003) (describing how to read players in online poker by observing the number

of pots they play, the cards shown, the amount of time a player takes to make a decision).

Experts that play their "position" at the poker table demonstrate how skilled players

combine observation and calculation to participate in more hands they can win, and avoid hands

they are likely to lose.

> Having position in Hold'em or being one of the last players to act in a
> hand is a great advantage.  You can just sit back and wait for everyone
> else in front of you to act.  If your opponent bets and you are strong,
> then you can raise, effectively doubling the amount of money that is
> put into the pot and raising other strong hands out of the pot by making
> it twice as expensive for them to call. . . . By acting last, you can get a
> better feel for the strength of your opponents' hands.

Helmuth, *supra*, at 23. Thus, later positions at the table provide players with additional

information that informs the relative strength of hands.  As poker professional T.J. Cloutier

summarizes in his introduction to playing position, assuming that players that have previously

bet are not acting as if they have particularly strong hands, "[t]o play from an early position, you

should have an A[ce]-Q[ueen of the same] suit[] or above.  From a middle position, fifth spot

and later, you might play A[ce]-J[ack] or [Ace]-10 [of the same] suit[] and up.  From a late

position into the blinds, you can play K[ing]-10 suited and above."  Cloutier & McEvoy, *supra*,

at 51-52.  Observation and awareness of a player's position at the table allows skilled players to

avoid hands they are likely to lose and play more hands they are likely to win than unskilled

players or players that merely calculate the odds of making a good hand without reference to

other players' actions.

**Deceivers**.  The ability to deceive is an essential element of poker success -- and has

virtually everything to do with skill and nothing to do with chance.  The converse of being a

skilled observer is being a skilled deceiver.  At the same time players attempt to glean

information from their opponents' bets, they must also alter their own strategy and bets in order

to prevent their opponents from gathering too much information about their own hands.  As

such, a player must be able to bluff, hide his or her tells, vary strategy, and vary the amount,

speed, and timing of bets in order to deceive other players. Phil Helmuth, one of the most

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

13

successful professional poker players, describes a number of techniques for deception that players can employ in online poker.  Helmuth observes that

> [t]he other players won't know anything about you except what you let them see. . . . You may show some of your weaker hands at the end of the hand even if you don't win the pot, in order to convey the illusion that you are a jackal.  Or you can show your strong hands faceup at the end of a hand in order to give people the impression that you are a mouse. . . .  You can also confuse the other players by showing down weak or strong hands in order to give them the wrong impression about how you play Hold'em.

Helmuth, *supra*, at 342-43.  By engaging in such deception, skilled players can confuse other players' observation skills and manipulate those players into folding strong hands or playing hands that the skilled player knows he or she can beat.  This conduct turns exclusively on skill and not at all on luck of the draw.

As the analysis of each of these three general categories of skill demonstrates, money won or lost in poker is a world apart from bets made in games of chance.  Unlike a bet in a game of chance, the "bet" in poker is a poker players' principal weapon in communicating with, manipulating, and intimidating their opponents and influencing the way individual hands turn out.  For example, a player may "slow play" a strong hand -- betting in a manner designed to make his or her opponents believe that he or she has a weak hand, by making small cautious bets -- in order to convince other players to make bets.  Hellmuth, *supra* at 381.  Alternatively, a player may bluff, by betting aggressively when he or she has a weak hand -- hoping to raise the stakes so much that other players choose not to continue to play their hands.  Hellmuth, *supra* at 147-58.  This stands in stark contrast to games of chance like roulette or craps.  In those games, the result -- what number the ball lands on or the roll of the dice -- is in no way affected by where a player places his or her chips on the craps or roulette table.  In poker, on the other hand, as discussed above, the characteristics of a bet have an enormous impact on which player eventually wins the hand.

Winning the hand outright, however, is not the only "good" result for a poker player.  The outcome of a hand of poker is not only who wins and who loses, but also how much each player wins or loses.  A player's assessment of his own cards and what cards the other players are holding will affect whether and how much the player bets.  Players that have the skills

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

14

described above and can read when other players have strong and weak hands, and can accurately assess their own hands will not only bet more efficiently, but also will fold their hands and "cut their losses" in such a way to reduce the amount of money lost. Thus, even when players do not "win" a hand, skilled players may "win" in the sense that they have lost less money on the hand than less skilled players would.

Moreover, regardless of the outcome of a particular hand, how a player plays one hand, and what he learns from that hand is vital to future hands. Over a series of hands, skill will even further predominate. Thus, an examination of the rules and structure of poker, as well as the decisions a poker player must make at each stage of the game reveal that poker is a game of skill. The effect of applying some of the strategies detailed above can also be measured empirically through statistical modeling and observation of real world results. Both the empirical studies and real world results confirm this analysis of poker rules and support a determination that poker is a game of skill.

### 2. Empirical Studies Have Uniformly Concluded That Poker Is A Game of Skill

Studies examining the effect of applying strategy to poker play have all reached the same conclusion: poker turns on skill. ASC briefly addressed one such study in its brief. ASC Br. at 14. A fuller examination of Professor Larkey's analysis, however, further demonstrates that each layer of skill -- calculation, observation, and deception -- contributes to success in poker games. *See* Larkey, *supra*, at 596. "The general behaviors mandated for player success" at Professor Larkey's simplified game were: "observation, memory, computation, knowledge of the random device, misleading opponents about the actual strength of your position, and correct interpretation and forecasts of opponents' behaviors. *Id.* at 597. To evaluate the relative importance of these areas of skill, singly and in combination, the authors programmed twelve different robot players who would compete against one another. Each was programmed to use a different combination of strategies. *Id.* at 599-605.

The simplest robot only knew the rules of the game -- when to bet and how much it was allowed to bet -- but aside from that essentially played randomly and without regard to its hand. A second robot understood the relative values of the hands. It would bet aggressively when it

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

was dealt a good hand, and hold back when it got a bad hand.  It ignored its opponents, while three other similar robots made conservative or aggressive assumptions about what the other player's hands contained.  Another robot bluffed aggressively. The more sophisticated robots watched their opponent's betting patterns and made deductions about what those opponents were likely to be holding.  Some of these robots would bluff by playing randomly a small percentage of the time in order to confuse other opponents capable of watching and learning.

The authors ran a tournament that pitted each robot player against each other player in 100 one-on-one games.  Over the course of the tournament, the random-play robot won only 0.4% of its games.  It lost $546,000.  The four robots that dominated the contest were the ones capable of sophisticated calculations about their odds of winning.  The robot that could only calculate odds came in fourth.  If poker were truly a game of chance, like roulette or craps, knowing how to calculate the odds precisely would be all of the skill necessary to maximize performance.  The fact that the robot who would calculate the odds precisely did not win demonstrates that much more than knowledge of the odds is required.  The robot that could calculate odds and that also bluffed occasionally came in third.  The two most successful robots of all were the robots that most closely emulated real poker players.  A robot that not only calculated odds but also observed fellow players and adjusted its style of play came in second at $400,000.

Even in a simplified version of poker, the best robot of all used all three categories of skill.  It calculated the odds it was playing against, which was essential to its success.  But it outperformed the others by employing the skills of deception and observation.  It deceived its competitors with strategic bluffs while it learned about and adjusted to its competitors' style of play.  It won 89% of the hands it played, and earned $432,000.  *See* Larkey, *supra*, at 601 tbl. 2.

Computers playing poker without simplified rules also do better if they are able to observe and deceive.  The American Association for Artificial Intelligence hosts a computer poker competition every year, pitting researchers at various institutions against each other in an attempt to build the best poker-playing computer.   In each computer poker competition, the different poker bots play millions of poker hands to determine the winner.  None of the winning

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

16

bots are simple "odds calculators," that one would expect to play just as well as the more complex programs if poker were a game of chance. Instead, the programs used observation and deceptions to determine the optimal betting strategies. *See* 2009 Poker Bot Competition Summary *available at* http://www.cs.ualberta.ca/~pokert/2009/results/.

Professor Noga Alon, *Poker, Chance and Skill* (attached as Ex. 5), like Professor Larkey, also performed a detailed analysis of several simplified models of poker. Alon identified a number of skills that empirically affect the results of a poker game. Alon tested this theory using a simplified version of "poker" where two players each received a random number between zero and one. The players could then bet one chip or fold. First, Alon tested the ability to calculate the odds of winning in light of the amount bet. Bob, the unskilled player, folded half the time and bet one chip half the time regardless of what number he received. Alice, the skilled player, was aware of Bob's strategy and played "optimally"—meaning she only bet a chip and played when her "hole" number was greater than ½. By calculating the odds of winning against the expected return of two chips, Alice gained a significant advantage over Bob. *Id.* at 9.

Professor Alon then demonstrated the effect of observation in a second variation. In that test, Bob began playing using Alice's strategy and bet only when his hole card was greater than ½. Alice then adapted her strategy and began betting only when her hole card was greater than ¾, again gaining a significant advantage by reading the other player and adapting her previously winning strategy to a new one. *Id.* at 9. As Alon summarized, this evidence proves that "[i]t is crucial for a winning [poker] player to stay unpredictable and to take into account the strategy of other players'."

Two other researchers, Laure Elie & Romuald Elie, *Chance and Strategy in Poker* (Sept. 2007) (attached as exhibit 6), expanded upon Alon's work. They added several wrinkles to Alon's simple game: varying and increasing stakes in different hands, the use of blinds, and in the impact of having more players at the table. In each of those scenarios, Elie and Elie pit Alice, a skilled player, against Bob, a player playing randomly. Elie and Elie found that chance played no more than a 30% role in the results of any single game -- even when they used the most "favorable" conditions to the unskilled players. Even in that most favorable case, the role

17

of chance dropped to a miniscule level as more and more hands were played.  As with the

Larkey study, Alon's study as expanded upon by Elie and Elie supports the description of the

skills necessary for winning poker above: deception and observation combined with an ability to

calculate odds all are skills that significantly affect the outcome of poker games.  *See also*

Abraham J. Wymer, *Chance and Skill in Poker* (confirming the validity of the Alon and Elie and

Elie studies) (attached as Ex. 7) ; Peter Borm & Ben van der Genugten, *On a Measure of Skill*

*for Games with Chance Elements* (1996) (finding that an extremely simplified "poker" game,

with three players playing with only four cards, valued at 10, 20, 30, and 40, has a skill level

more than *double* that of blackjack) (attached as Ex. 8).

> ### 3.        Real World Results Demonstrate That Poker Is A Game of Skill

The number of identifiable skills required to excel at poker and the simulations and

studies just discussed all predict that, in real life, the more skilled players who apply strategies

related to calculation, observation and deception will win more often than those that apply none

or only some portion of each strategy.  In fact, that is what actual poker play makes clear.  The

best poker players beat other poker players as often as the best golfers beat other golfers, if not

more often.  It is true that poker has a "random device" (*see* Larkey, *supra*, at 597) that

introduces short term uncertainty into each hand, but over time the randomness of the cards

evens out and all players eventually get the same share of good and bad hands.  Their results

differ based on how skillfully they play those hands.

As the analysis of the rules and the empirical studies above indicate, skilled players

should be able to win hands and money at a greater than chance rate based on the decisions they

make rather than the cards they hold and win pots with regularity even when their hands are not

the best hands at the table.  Indeed, as ASC states in its brief, "in a recent statistical analysis of

over 100 million actual poker hands, the players' decisions *alone* rather than the cards dealt,

accounted for the result in 76% of all the hands played where all players folded to a single

winning player."  ASC Br. at 13; *see* Paco Hope & Sean McCulloch, *Statistical Analysis of*

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

18

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

*Texas Hold 'Em* 5 (Mar. 4, 2009).[30]  In other words, in 76% of hands played, all but one player folded, making the remaining player the hand's winner, and the actual cards were never revealed.  Moreover, according to this report, in roughly 50% of hands that do play to a showdown,[31] a player who would have won had he stayed in will have folded, meaning that in only 12% of hands -- that is, half of the 24% that play to showdown -- does the player who was dealt the "luckiest" hand win.[32]  *Id*.  With player decisions deciding close to 90% of all poker hands, the players who consistently make good decisions will win.  Those who do not will generally lose.[33]

Such a result is consistent with mathematical probability.  As Professor Zvi Gilua observed, in the vast majority of hands dealt to a player -- 85 percent -- a player will have one of the three lowest ranked hands: high card, one pair, or two pair.  Zvi Gilua, Expert Opinion (attached as Ex. 10).  Stronger hands, on the other hand, are much rarer -- a player has only a 4.6% chance of being dealt a straight and a 3% chance of holding a flush.  The "similar hands" effect is magnified in a game like Texas Hold 'Em where the majority of cards are community cards, which are shared among the players.  For example, if the "flop" is three cards of the same suit, it is *much* more likely that more than one player will make a flush than if the flop contains cards of three different suits.  It follows then that in most hands players are playing relatively ordinary cards that are close in value to their opponents' and are not particularly "lucky" or "strong."  Consequently, the skill in forcing another player out of a hand before more same-

---

[30] http://www.cigital.com/resources/gaming/poker/100M-Hand-AnalysisReport.pdf (attached as Ex. 9).

[31] As described above, a "showdown" is when all of the cards have been dealt and the players still in the hand expose their hole cards and the best hand wins the pot.

[32] Twelve percent is also the gap between white and black winning percentages in a study of chess matches.  *See e.g.* Jonathan Rowson, *Chess For Zebras: Thinking Differently About Black and White* 193 (Gambit Publications 2005) ("[T]he conventional wisdom is that White begins the game with a small advantage and, holding all other factors constant, scores approximately 56% to Black's 44%").

[33] The same is true in bridge.  As the Supreme Court of California has noted, "although there is of course an element of chance resulting from the deal of the cards, there is a continually recurring necessity in the bidding and play of the hand to make decisions which, considered together, will ordinarily be determinative of the outcome of the game."  *In re Allen*, 377 P.2d at 281-82.

No. 09-CV-1495 JM RBB

suited cards are dealt as community cards is all the more important.  *See* Giulia at 10-12

(explaining certain cards improve hands for whole table, while others improve only particular

players' hands).

A striking example of the limited role that the cards play in determining the outcome of

poker matches may be found in the recent story of Annette Obrestad, a 19-year-old poker

prodigy who beat 179 other players -- without looking at her own cards (except one peek on one

hand).  *See* Shawn Patrick Green, *Online Poker: Interview With Annette 'Annette_15' Obrestad*,

CardPlayer.com (Aug. 12, 2007).[34]  Obrestad's feat shows it is the player's skill at betting,

bluffing, reading opponents, deceiving and learning from prior hands, rather than the deal of the

cards that determines the outcome of poker play.[35]

The same result is demonstrated by comparing the results of recent golf and poker

tournaments.  In the 25-year period beginning with 1976 and ending in 2000, 21 different

players won the World Series of Poker.[36]  One player won three times in that span (Stu Ungar),

and three more players won twice (Johnny Moss, Doyle Brunson and Johnny Chan).  Three of

these repeat winners won back-to-back wins in consecutive years (Brunson, Ungar and Chan).

Fourteen of the twenty-one were "repeat finalists" who finished among the top ten in one or

more of the other tournaments.[37]

In the same period, there were twenty-two different winners of the PGA Championship,

and three multiple winners.  Only Tiger Woods won back-to-back titles.  Fifteen of the twenty-

two champions made it into the top ten in another Championship.  These numbers confirm that,

as examined from a results perspective, poker requires as much skill as golf to win consistently.

---

[34] http://www.cardplayer.com/poker-news/article/2536-online-poker-interview-with-annette-annette-15-obrestad, last accessed Feb. 9, 2009.

[35] This example also refutes the conclusion that the "chance" of what a player is dealt as initial hole cards has a substantial affect on outcome; it cannot affect someone who never looks at them.

[36] Results of all World Series of Poker Tournaments for this period are available at http://www.worldseriesofpoker.com/tourney/results.asp.

[37] *Id.*

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

20

*See* Croson, *et al.*, *supra*,  at 27-28 (concluding that golf and poker require similar amount of skill to win based on an analysis of real world results of golf and poker tournaments).

Furthermore, the fact that a novice poker player can improve his talents and raise the level of his game through study and accumulating game experience demonstrates that skill is involved. After only a short time, a player can acquire basic game skills, such as learning when to fold and how to make the basic calculations.  The more a person continues to practice and learn, the more his skills will improve, something that is also true for chess, golf, and bridge players.  If poker were a game of chance, then the learning curve would not be as pronounced.

### 4.    Online Poker Is A Game Of Skill

Online poker requires many of the same decisionmaking skills as live poker—and thus is also a game of skill.  The online poker room replicates much of the live poker experience. Players play at tables of up to ten players with other humans.  They can engage in live chat with other players.  Players place bets are real time, and players can observe the speed at which other players bet.[38]

When playing online poker, a player will make the strategic decisions discussed above based on deductions about an opponent that are derived from the opponent's moves themselves and from remembered (or recorded) prior game play.  In fact applying the lessons of prior game play to the current situation—much like a caddy's notes on previously played holes in a golf tournament or notes on another player's bidding history in bridge—is the skill that may be most essential to poker success.  Analyzing that prior history and predicting opponents' behavior is the same whether the play is online or live.[39]  Moreover, while a player may learn something from looking at another live player – watching facial expressions and the like for tells – online

_____

[38] Demonstration versions of online poker sites where players do not wager real money are available at www.FullTilt.net and www.PokerStars.net.

[39] Indeed, some professional poker players are able to win with enough frequency in online poker as to earn a living.  *See Establishing Consistent Enforcement Policies in the Context of Internet Wagers:  Hearings Before the H. Comm. on the Judiciary*, at 2, 5 (Testimony of Annie Duke on behalf of the Poker Players Alliance), http://judiciary.house.gov/hearings/pdf/ Duke071114.pdf) (regarding supporting her family for 13 years as a professional poker player, and doing so, in part, by playing poker online).

No. 09-CV-1495 JM RBB

poker requires different but equivalent sensitivity to an opponent's play.  For example, players often send messages to one another during online poker play, and learning to make deductions about a player's style and hand from those messages is a skill.  Similarly, being able to learn from the timing of opponents' moves is a skill.

Indeed, online poker involves special skills not required in live play, and has characteristics that even further reduce the role of chance in determining outcomes.  First, online play typically involves many more hands than an ordinary live poker match because hands are dealt much faster and many players play multiple tables simultaneously.  Approximately 95% of players that play on a given day play eleven or more hands.  Whatever small element of chance is involved in individual hands thus evens out as a statistical matter more quickly than in live play.  Second, players can track data about other players' betting patterns in detail.  Being able to process and apply a large amount of detailed data about a number of opponents' betting histories is a skill in itself.  For all these reasons, online poker requires specialized skills that live play does not.

Together, the specific skills required to play poker in general and online poker in particular combined with the fact that poker hands are won by maneuvering rather than in a showdown the vast majority of the time, and the fact that in every hand the players' skill determines the amounts won and lost by each player, show that skill is required to be a winning poker player.  Indeed, none of the empirical studies described in this brief focused on a players' ability to read another players' face, mannerisms or other physical signals in determining that poker is a game of skill.

In sum, there can be no comparison between online peer-to-peer poker and a quintessential game of chance, like those enumerated in the IGBA's definition of gambling, which has "an outcome that is decided solely by the circuitry of the machine that was programmed into it when its software was created. . . . [T]he player has no ability to affect the outcome of the game other than playing the game enough times that the laws of probability, and the pre-programmed circuitry, will allow him to win something at some point."  *People v.*

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

22

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

*Delacruz*, 872 N.Y.S.2d 876, 880 (N.Y.C. Crim. Ct. Kings County 2009).  Poker is therefore not "a game of chance or lottery," and it is not within the IGBA's prohibitions.[40]

## IV.    POKER IS A PERMITTED GAME OF SKILL UNDER STATE LAW AND SO IS NOT PROHIBITED BY THE IGBA.

As noted, the IGBA applies only to gambling businesses that both fall under the statute's definition of "gambling" *and* are prohibited under state law.  Even if the Court concludes that the IGBA's definition of gambling is broad enough to encompass anything a state defines as gambling, even chess, spelling bees or 5k running races, without any sort of threshold examination of whether the prohibited activity is gambling, poker is still not gambling under the laws of nearly all states -- including California.   As noted, where a game contains elements of both skill and chance, as poker does, the common state law test for whether an activity is a game of skill or a game of chance is often the "dominant factor" test or a variation thereof.

Gaming is unlawful in most States only if three elements are present: "consideration, chance, and reward."  *Dent*, No. 2008-733, slip op. at 4.  "[I]t is apparent that the ante and the betting is consideration and that the pot is the reward."  *Id*.  But the element of chance is lacking. As the *Dent* court put it, "if chance predominates, [poker] is gambling.  If skill predominates, it is not gambling."  *Id*.  This "dominant factor" test has been adopted by the highest courts of Nebraska, California, Nevada, and Utah among others.  *See, e.g.*, *Indoor Recreation Enters., Inc. v. Douglas*, 235 N.W.2d 398, 400 (Neb. 1975); *In re Allen*, 377 P.2d at 281; *Las Vegas Hacienda, Inc. v. Gibson*, 359 P.2d 85, 87 (Nev. 1961); *D'Orio v. Startup Candy Co.*, 266 P. 1037, 1038 (Utah 1928); *see also* Michael A. Tselnik, *Check, Raise, or Fold: Poker and the*

---

[40] It is not surprising then that poker stands apart from the games of chance like those listed in the IGBA -- television viewers do not tune in to watch a roulette wheel spin, but millions watch the world's best poker players out-duel others on the World Poker Tour, the World Series of Poker, or Poker After Dark.  Poker's television popularity demonstrates that "skill" rather than "chance" drives the game.  Like golf or football, it is the absence of chance, not its presence that rewards the watcher, even the most casual one.  Indeed, networks are devoting increased time to poker programming.  NBC airs over 324 hours of poker programming per year, not including repeat programming on CNBC or other wholly owned networks.  Typically poker ratings equal or surpass those of many televised sporting events, such as women's golf, Indy car racing, and regular season college basketball.   By contrast, the short-lived Ultimate Blackjack Tour on CBS was unable to sustain an audience and was quickly cancelled because unlike sporting events or skill competitions, games of chance do not make for compelling television.

*Unlawful Internet Gambling Enforcement Act*, 35 Hofstra L. Rev. 1617, 1663 (2007) ("Most jurisdictions favor the dominant factor test.").

Other states have excluded from their definitions those games that are "[b]ona fide contests of skill, speed, strength, or endurance in which awards are made only to entrants or the owners of entries." *See e.g.* Wyo. Stat. Ann. § 6-7-101(iii)(A) (2006); N.D. Cent. Code. § 12.1-28-01(1)(a) (2007). Still other states have limited gambling to games of chance by defining "bet" to "mean[] an agreement that, dependent upon chance even though accompanied by some skill, one stands to win or lose something of value." Ga. Code Ann. § 16-12-20(1) (2009); *see also* N.M. Stat. § 30-19-1(B) (West 2009); Kan. Stat. Ann. § 21-4302(a) (West 2009).

New York, the location of the United States Attorney's Office effecting this seizure, employs essentially the same test. *See, e.g.,* N.Y. Penal Law § 225.00(1) (McKinney 2008) ("[A] '[c]ontest of chance' [is] any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein."); *see also New York v. Hua*, 2009 WL 1575188, *3 (N.Y.C. Crim. Ct. Queens County June 5, 2009) (dismissing case because there was "no support given for the claim that mahjong is a game of chance"). As the *Hua* court explained:

> [W]hile some games may involve both an element of skill and chance, if the "outcome depends in a material degree upon an element of chance," the game will be deemed a contest of chance. "The test of the character of the game is not whether it contains an element of chance or an element of skill, but which is the dominating element that determines the result of the game?" It follows then that wagering on the outcome of a game of skill is therefore not gambling as it falls outside the ambit of the statute.

*Id.* at *2 (emphasis added) (citations omitted).

Under any of these tests, the "chance" element is lacking in peer-to-peer online poker. It follows that online peer-to-peer poker does not violate these states' laws. *Compare Dent*, No. 2008-733, slip op. at 13-14 ("Using the predominance test . . . . [t]his court finds that Texas Hold'em poker is a game where skill predominates over chance.") *with Commonwealth of Pa., Pa. Liquor Control Bd. v. Liberty Fire Co. of Schuylkill Haven*, 537 A.2d 974, 976 (1988) (indicating that state gambling law extends to raffle tickets because they are "purely games of

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

24

1    chance, where the element of skill is inconsequential"); *see also In re Allen*, 377 P.2d at 281

2    (collecting cases).

3         Because the IGBA incorporates into federal law the states' own decisions about what

4    constitutes proscribed gambling, the statute does not apply to poker because poker is generally

5    legal under state law.  If online poker comprises an "illegal gambling business" even though

6    online poker is not a game of chance, then online bridge tournaments must too, as well as online

7    card games like hearts and spades, and puzzle games like those found at Skilljam.com and

8    Worldwinner.com.  This reading would not only violate the spirit of the IGBA, but it would also

9    lead to an absurd result.  *United States v. Ryan*, 284 U. S. 167, 175 (1931) ("A literal application

10   of a statute which would lead to absurd consequences is to be avoided whenever a reasonable

11   application can be given which is consistent with the legislative purpose.").

12   **V.    CONCLUSION**

13        UIGEA specifically permits payment processors to process the transactions at issue here,

14   and thus the government should not be permitted to seize assets related to expressly lawful

15   activity by using inapplicable statutes.  Even if those statutes could apply to the transactions at

16   issue after Congress passed UIGEA, playing poker online is not unlawful because it is a game of

17   skill.  As such, it is neither "gambling" as defined by the IGBA nor is it unlawful under state

18   law.  As such, this Court should compel the government to return the seized funds to ASC.

19

20   Dated: August 7, 2009                SONNENSCHEIN NATH & ROSENTHAL LLP

21

22

23

24   By_____/s/ Sekret T. Sneed_____
              SEKRET T. SNEED
25   Attorneys for *Amicus Curiae* Poker Players
     Alliance

26

27

28

SONNENSCHEIN NATH & ROSENTHAL LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

No. 09-CV-1495 JM RBB

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California, I am over the age of 18 and not a party to the within action. My business address is: ☒ 601 So. Figueroa Street, Suite 2500, Los Angeles, CA 90017.

On August 7, 2009, I served the foregoing document, described as **BRIEF OF AMICUS CURIAE POKER PLAYERS ALLIANCE IN SUPPORT OF MOVANT** on the interested parties in this action, as follows:

L. Barrett Boss
Cozen O'Connor
1627 I Street, NW
Suite 1100
Washington, DC 20006
bboss@cozen.com

☐ **(VIA MAIL)** I placed a true copy of the foregoing document in an envelope addressed to each interested party as set forth above. I sealed each such envelope, and placed same, with postage thereon fully prepaid, for collection and mailing at Sonnenschein Nath & Rosenthal, Los Angeles, California 90017. I am readily familiar with Sonnenschein Nath & Rosenthal's practice for collection and processing of correspondence for mailing with the United States Postal Service. Under that practice, the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

☐ **(VIA PERSONAL SERVICE)** I served a true copy of the within document on the interested parties in this action by personally hand delivering a copy of said document to the addressee listed on this proof.

☐ **(VIA FACSIMILE)** I caused a true copy of the foregoing document to be served by facsimile transmission to each interested party at the respective facsimile numbers listed. A transmission report was properly issued by the sending facsimile machine for each interested party served.

☒ **(VIA ELECTRONIC MAIL)** I transmitted the above document(s) by electronic mail to the interested parties via the e-mail addresses listed above for each party.

(FEDERAL COURT ONLY)

☒ I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made. OR ☐ I declare that I have been retained by a member of the bar of this Court at whose direction this service was made.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 7, 2009, at Los Angeles, California.

_____/s/_ Felix T. Woo_____
Felix T. Woo

PROOF OF SERVICE